ANR PIPELINE COMPANY and ANR
Storage Company, Plaintiffs,

v.

Eric J. SCHNEIDEWIND, Matthew E.
McLogan, and Edwyna G.
Anderson, Defendants.

No. G84–438 CA.

United States District Court,
W.D. Michigan, S.D.

Aug. 22, 1985.

Mika, Meyers, Beckett & Jones by John C. Jones, Grand Rapids, Mich., for plaintiffs.

Frank J. Kelley, Atty. Gen., by Don L. Keskey, R. Philip Brown, Jeffrey S. Fishman, Asst. Attys. Gen., Lansing, Mich., for defendants.

OPINION

HILLMAN, District Judge.

I. INTRODUCTION

This is an action for declaratory relief challenging defendants' assertion of jurisdiction over plaintiffs' securities issues under the Michigan public utilities securities statute, M.C.L.A. § 460.301, *et seq*, M.S.A. § 22.101, *et seq.*, (hereinafter referred to as "Act 144"). The Michigan Public Service Commission (MPSC), originally a named defendant, was dismissed from the case by opinion and order entered on September 7, 1984. The remaining defendants are Eric J. Schneidewind, member and chairperson of the MPSC, and Matthew E. McLogan and Edwyna G. Anderson, the remaining two members of the MPSC, all in their official capacities.

The record in the case consists of a written stipulation of facts, an appendix thereto, the pleadings, plaintiffs' answers to three sets of interrogatories and plaintiffs' replies to two sets of requests for admissions. The parties have stipulated that the case should be determined on this record. The parties have submitted briefs on the legal issues to be decided, and the Court has heard oral arguments on those issues.

On the stipulated record, the following issues have been submitted to the court for decision: (1) whether federal regulatory schemes applicable to plaintiff companies have preempted the state regulation of securities issues provided by Act 144; (2) whether application of Act 144 to plaintiffs violates the Commerce Clause of the United States Constitution because (a) such application so infringes on national uniformity requirements as to materially and unreasonably burden interstate commerce, and/or (b) such application otherwise so materially and unreasonably burdens interstate commerce. On these grounds, plaintiffs seek a judgment declaring that the defendant commissioners, in their official capacities, have no jurisdiction to regulate or otherwise interfere with plaintiffs' securities issues and plaintiffs may therefore lawfully issue their securities without obtaining the prior approval of defendants.

## II. DISCUSSION

A. *Facts.* Because the stipulation of facts is part of the record, only the minimum facts necessary to frame and resolve the legal issues will be restated here.

Plaintiffs ANR Pipeline Company ("Pipeline Company"), a Delaware corporation, and ANR Storage Company ("Storage Company"), are wholly-owned subsidiaries of American Natural Resources Company ("ANR"), a diversified holding company incorporated in Delaware. The principal offices of ANR, Pipeline Company, and Storage Company are located in Detroit, Michigan.

Pipeline Company owns and operates an interstate natural gas pipeline system which transports and sells natural gas for resale only to 51 gas distribution customers in Michigan, Wisconsin, Iowa, Illinois, Indiana, Kansas, Missouri, Ohio and Tennessee. Pipeline Company has no direct retail customers in Michigan.

Pipeline Company operates 15 gas storage fields in Michigan. Eight of those fields are owned by Michigan Consolidated Gas Company ("MCGC") and leased to Pipeline Company. Pipeline Company owns and operates 773 miles of gas transmission pipeline and associated equipment located in Michigan, including two multiple, large-diameter pipelines entering Michigan from Indiana,[1] one such pipeline entering Michigan from Ohio, and two transmission lines extending between Wisconsin and Michigan in the upper peninsula. Pipeline Company also owns and operates 195 miles of field and storage pipelines, two transmission compressor stations and ten underground storage compressor stations in Michigan.[2] In 1983, over 50% of Pipeline Company's sales were in Michigan, approximately 45% in Wisconsin, and less than 5% in other states.

Storage Company operates gas storage reservoirs to store gas for nonaffiliated customers. Storage Company does not sell natural gas. Four storage fields are presently operational in Michigan, all located in Kalkaska County in the northern lower peninsula. These fields are connected to transmission pipeline of Great Lakes Gas Transmission Company ("Great Lakes") in Crawford County by approximately 24 miles of Storage Company's underground storage lines.

During the summer, natural gas from Great Lakes is delivered to Storage Company by displacement, a commonly employed pipeline company practice of exchanging equivalent volumes of gas at a mutually convenient place in lieu of actual physical delivery of the storage gas. Storage Company stores the gas in one or more of its four gas storage fields and redelivers it on demand within contractual entitlement to Great Lakes for the account of the storage customer. The gas received and injected

---

1. The two pipelines entering Michigan from Indiana connect to three local gas distribution utilities in the western lower peninsula of Michigan: MCGC, Michigan Power Company and Michigan Gas Utilities Company.

2. Outside the state of Michigan, Pipeline Company owns and operates 6,947 miles of gas transmission pipeline and associated equipment, 3,507 miles of gathering lines, 35 transmission compressor stations and 54 field compressor stations.

into storage is produced in Western Canada. The gas withdrawn and redelivered rejoins the gas stream flowing in Great Lakes' pipeline.

All of the gas stored by Storage Company is supplied by its customers outside of Michigan for transmission to Storage Company's facilities by displacement or otherwise. When withdrawn from storage, these volumes of gas are transmitted, by displacement or otherwise, back to Storage Company's customers for use outside the state of Michigan. Thus, Storage Company's customers use Great Lakes' pipeline to transport their gas to and from Storage Company's facilities. Storage Company's storage charges include the costs associated with transporting the gas to and from Great Lakes' transmission line through Storage Company's pipelines to and from the storage fields themselves. Storage Company takes and relinquishes possession of the storage gas at the Deward, Michigan, interconnection between its pipeline and the Great Lakes' transmission lines. In addition to its storage fields and lines, Storage Company has three compressor stations and associated gas injection and withdrawal facilities in Michigan.

Storage Company does not provide storage service to or for Pipeline Company. Storage Company's reservoirs and facilities are not engineered or used as pressure apparatus in, nor are they necessary to, the proper operation of Pipeline Company's system operations.

Storage Company has seven customers consisting of gas pipeline and transmission companies in Texas, Alabama, Missouri, Indiana, Tennessee and Manitoba. All but one of the customers use (d) Pipeline Company to transport their gas to and from Storage Company facilities. One customer

used Great Lakes. None of Storage Company's customers purchased their stored gas from Pipeline Company.

Pipeline Company is a "natural gas company," as that term is defined in the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717 *et seq.*,[3] and is therefore subject to the regulatory jurisdiction of the Federal Energy Regulatory Commission ("FERC"). Pursuant to the NGA, the FERC has regulatory jurisdiction over (1) the interstate transportation of gas (including gas storage used to balance fluctuating demand with supplier deliveries), (2) the interstate sale of gas for resale, and (3) the natural gas companies engaged in such interstate transportation and sale for resale.[4] Accordingly, the FERC has jurisdiction over all of Pipeline Company's transportation, storage, sales for resale, rates and charges, construction of new facilities, extension or abandonment of services and facilities, and certain other matters. The FERC has further jurisdiction to review and consider specific long-term financing plans for particular construction projects.[5] The FERC requires issuance of certificates of public convenience and necessity for any significant expansion of the company's facilities or services,[6] but no FERC filings are necessary for short-term financing or for financing other than construction.

Storage Company, according to plaintiffs and as treated in FERC orders, is also a "natural gas company" under the NGA, thereby subject to FERC regulatory jurisdiction.[7] Storage Company, like Pipeline Company, holds certificates of public convenience and necessity issued by the FERC when required for significant expansions of facilities or services, but no FERC filings

---

**3.** 15 U.S.C. § 717a(6) defines natural gas company as "... a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."

**4.** 15 U.S.C. § 717(b).

**5.** 15 U.S.C. § 717f.

**6.** 15 U.S.C. § 717f(c)(1)(A).

**7.** Although admitting that the FERC does exercise general regulatory jurisdiction over Storage Company's facilities and gas operations, defendants contend that the FERC has no such jurisdiction because gas storage, in their view, is not within the ambit of "sale or transportation of natural gas in interstate commerce."

are required for short-term financing or for financing other than construction.

All parties agree that the FERC does (and the MPSC does not) exercise general regulatory jurisdiction over Storage Company's facilities and gas operations, and over all of Pipeline Company's transportation, storage, sales for resale, rates and charges, construction of new facilities, extension or abandonment of service and facilities, and certain other matters. Although lacking general regulatory jurisdiction over either plaintiff, the MPSC has exercised authority under Act 144 over securities issued by Pipeline Company since Pipeline Company was established in 1945, except for the period of 1970–1979.[8] Since 1979, Pipeline Company has received unconditional approval of all seven of its securities issue applications. Six applications gained approval within three to six weeks; the remaining application took 8 months to secure approval. The MPSC has exercised the same authority over securities issued by Storage Company, which was organized in 1978, continuously since 1979. During that period, Storage Company received unconditional approval of all three applications it submitted, each within three to six weeks. All applications filed since 1979 by either plaintiff have raised the issue of MPSC jurisdiction under Act 144, but the issue has never been litigated prior to this lawsuit.

### B. *Legal Issues*

#### 1. *Preemption Claim*

Plaintiffs claim that the federal regulatory schemes applicable to them have preempted the state regulation of securities issues provided by Act 144.

Act 144 provides that a utility may issue long-term securities only if authorized by the MPSC.[9] In passing on written applications for securities issuance, the MPSC is authorized to investigate, hold hearings, examine witnesses and any written materials it deems of importance in reaching a determination.[10] The MPSC must grant authority for the issuance if it is "satisfied that the funds derived from the [securities] issue ... are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes," although the MPSC may impose reasonable terms and conditions on the grant of authority.[11]

State laws like Act 144 may be preempted by federal law in three different ways. *Michigan Canners & Freezers Assoc., Inc. v. Agricultural Marketing &*

---

**8.** During the 1970's, the MPSC concluded that such security issuances were *not* subject to MPSC consideration under Act 144, pursuant to the Michigan Court of Appeals' decision in *Great Lakes Transmission Co. v. MPSC,* 24 Mich.App. 77, 180 N.W.2d 59 (1970). However, following and pursuant to the Michigan Supreme Court's decision in *Michigan Gas Storage Co. v. MPSC,* 405 Mich. 376, 275 N.W.2d 457 (1979), securities issuance applications were again filed with the MPSC under Act 144.

**9.** M.C.L.A. § 460.301(1), M.S.A. § 22.101(1), provides, in pertinent part:

"A ... corporation ... organized or authorized to do business under the laws of this state ... exercising or claiming the right to carry or transport natural gas for public use, directly or indirectly ... or engaged in the business of piping or transporting natural gas for public use, directly or indirectly, or engaged in the business of purchasing natural gas for distribution may issue stocks, bonds, notes, or other evidences of indebtedness payable at periods of more than 12 months after the date of issuance, if necessary for the acquisition of property, the construction, completion, extension, or improvement of facilities or for the improvement or maintenance of service or for the discharge or lawful refunding of obligations and may issue stock to represent accumulated earnings invested in capital assets and not previously capitalized, if the Michigan public service commission issues an order authorizing the issue and the amount of the issue, and states that in the opinion of the commission the use of the capital or property to be acquired to be secured by the issue of the stock, bonds, notes, or other evidences of indebtedness, is reasonably required for the purposes of the ... corporation ... or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized ..."

**10.** M.C.L.A. 460.301(2); M.S.A. § 22.101(2).

**11.** M.C.L.A. § 460.301(3); M.S.A. § 22.101(3).

*Bargaining Board*, 467 U.S. 461, 104 S.Ct. 2518, 2522, 81 L.Ed.2d 399 (1984). Congress, in the federal enactment, may explicitly mandate preemption of state law. *E.g., Shaw v. Delta Airlines*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Even absent express preemptive language, Congress may manifest an implied intent to occupy the field of regulation, thereby displacing state regulations in the same area. *E.g., Fidelity Federal Savings & Loan Ass'n. v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Finally, state law is displaced to the extent it actually conflicts with federal law, even in the absence of express preemptive language or implied congressional intent to preempt. Such a conflict is recognized when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *See also, Fidelity Federal Savings & Loan Ass'n.*, 458 U.S. at 153, 102 S.Ct. at 3022. Applying these principles to the facts of this case, I am satisfied that defendants' assertion of jurisdiction over plaintiffs' securities issues pursuant to Act 144 has not been preempted by federal law.

First, neither the NGA nor the federal Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, contains express preemptive language with respect to utilities securities transactions, nor do they manifest Congressional intent to occupy the entire field of utilities securities transactions. Accordingly, plaintiffs rely on the third preemption ground, namely, that state law is displaced to the extent it actually conflicts with federal law. Plaintiffs claim that Act 144 is potentially disruptive of the FERC's broad regulatory authority under the NGA and of the "delicate balance Congress created between this broad general regulation of natural gas companies under NGA and the type of regulation of security issuances by such companies provided by the federal securities statutes." On the basis of this "potential disruption", plaintiffs conclude that Act 144, as applied to them, is in actual conflict with and must be preempted by the combined effect of the referenced federal statutes. I disagree.

Under the NGA, the FERC has authority to review financing information in certificate proceedings, including authority to review and consider specific long-term financing plans for certain construction projects. *See* 15 U.S.C. § 717f(c) and (e); 18 C.F.R. 157.14(a)(14). The FERC also has authority to review financing information in rate matters pursuant to 15 U.S.C. § 717d. *See* 18 C.F.R. 154.62 and .63. No FERC certification, however, is required for short-term financing or for financing unrelated to construction. Most significantly, nowhere does the NGA grant specific authority to the FERC to regulate the securities issues of natural gas companies. No FERC pre-issuance approval is required.

The federal Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, (hereinafter the "1933 Act"), and the Michigan Uniform Securities Act, M.C.L.A. § 451.501, *et seq.;* M.S.A. § 19.776(101), *et seq.*, generally govern securities transactions. Both schemes require prior disclosure by proposed securities issuers through filing of a registration statement. If the registration statement discloses the statutorily required information, the statement automatically becomes effective 20 days after filing. *See,* 15 U.S.C. § 77h(a); M.C.L.A. §§ 451.702(c) and .703(c). The objective of the 1933 Act was to "provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). The Michigan Uniform Securities Act was similarly designed to protect the public from

deception or fraud in securities transactions within the State of Michigan by requiring that certain securities and transactions be registered prior to issuance. *People v. Dempster*, 396 Mich. 700, 242 N.W.2d 381, 384 (1976).

Michigan's Act 144 is intended to protect both investors in utility securities, creditors of those utilities and utility ratepayers. In *Michigan Gas Storage Company v. Michigan Public Service Comm.*, 405 Mich. 376, 275 N.W.2d 457 (1979), the Michigan Supreme Court recognized that utilities securities regulation was intended to serve interests which facilities, service and rate regulation by the FERC might not be sufficient to protect. In addition to protecting investors from "the evils of overcapitalization," *Id.*, 275 N.W.2d at 462, the Supreme Court identified the following additional objectives of Act 144:

"... Proper securities regulation serves the interests of the ratepayers in assuring continued service without interruption from utilities and in receiving that service at reasonable rates. For example, physical property of a company within the state, essential to the company's ultimate service to the public, could be jeopardized by inadequate financing, resulting in a failure in that service. We see no reason to conclude that the Legislature would have intended to forego participation in regulating matters affecting interests with respect to which the state may properly exercise its protective powers because it is not also regulating some other aspects of the business."

*Id.*

Plaintiffs do not argue, nor could they, that joint compliance with the NGA, the 1933 Act, and Act 144 is a "physical impossibility." Instead, they claim that although joint compliance is physically possible, the "cumbersome and ill-defined" regulatory process under Act 144 may "potentially" delay, disrupt or disapprove proposed issuances needed to finance FERC approved projects. This "potential disruption," plaintiffs claim, stands as an obstacle to execution of the full objectives of the federal regulatory scheme, and hence must be deemed preempted by federal law.

The record reveals that since 1979, plaintiffs' combined securities issue applications, totaling 10, have all received unconditional approval under Act 144, with all but one of the 10 receiving that approval within three to six weeks. Accordingly, the average potential delay beyond the 20-day automatic effective date for registration statements under the 1933 Act is limited to three weeks or less. There is no indication that any FERC certification or rate proceeding has ever been disrupted or in any way affected by these Act 144 proceedings. Thus, compliance with both the federal and state regulations has historically been accomplished with minimal, if any, delay or disruption.

Further, Act 144 proceedings are well-defined. Short-term borrowings are exempt under Act 144. As to other borrowings, the MPSC's inquiry is "limited to whether there is a need to issue securities to obtain funds for a lawful purpose of the utility and does not extend to whether, to accomplish that purpose, there is need for the project to which the funds will be devoted." *Kelley v. Michigan Public Service Comm.*, 412 Mich. 385, 316 N.W.2d 187, 190 (1982). In other words, the reasonableness of the underlying project is not a material inquiry in such a proceeding; instead, the proceeding "is limited to a review of the financial decisions of the utility." *Id.*, 316 N.W.2d at 193. Although Act 144 authorizes the MPSC to hold hearings, examine witnesses, and make any inquiry or investigation it considers of importance in reaching a decision,[12] all ten of plaintiffs' combined applications since 1979 have been approved *ex parte*, without hearings.[13] Rather than

---

**12.** M.C.L.A. § 460.301(2); M.S.A. § 22.101(2).

**13.** The stipulation of facts indicates two instances where applications were filed by plaintiffs and then withdrawn by them when the MPSC indicated that a hearing would be held. *See,* Stipulation of Facts, pp. 13 & 24. Plaintiffs cannot expect me to speculate on the "ill-defined and cumbersome" nature of a hearing process they have never submitted to.

bolstering plaintiffs' contentions, these facts tend to weaken their claim that Act 144's "cumbersome and ill-defined" regulatory process is potentially disruptive of or an obstacle to execution of the full objectives of the federal regulatory scheme.

In reviewing the legislative history and genesis of FERC regulatory jurisdiction under the NGA, the United States Supreme Court noted the following in *Panhandle Eastern Pipe Line Co. v. Comm'n.*, 332 U.S. 507, 520, 68 S.Ct. 190, 196–97, 92 L.Ed. 128 (1947):

> "The Natural Gas Act created an articulate legislative program based on a clear recognition of the respective responsibilities of the federal and state regulatory agencies. It does not contemplate ineffective regulation at either level. We have emphasized repeatedly that Congress meant to create a comprehensive and effective regulatory scheme, complementary in its operation to those of the states and in no manner usurping their authority."

The Supreme Court emphasized that the NGA was "motivated, designed and shaped to bring about more effective regulation ... particularly more effective state regulation," *Id.*, at 519, 68 S.Ct. at 196, and observed that:

> "[t]he Act, though extending federal regulation, had no purpose or effect to cut down state power. On the contrary, perhaps its primary purpose was to aid in making state regulations effective, by adding the weight of federal to supplement and reinforce it in the gap created by prior decisions. The Act was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way."

*Id.*, at 517–18, 68 S.Ct. at 195–96.[14] The Supreme Court further explored the purpose of the NGA in *Maryland v. Louisiana*, 451 U.S. 725, 747–48, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981):

> "In 1938, Congress enacted the Gas Act to assure that consumers of natural gas receive a fair price and also to protect against the economic power of the interstate pipelines ... The Gas Act was intended to provide the Federal Power Commission, now the FERC, with authority to regulate the wholesale pricing of natural gas in the flow of interstate commerce from wellhead to delivery to consumers." (Citations omitted)

To that stated end, the NGA permits comprehensive regulation of facilities, services and rates of natural gas companies, but nowhere does it explicitly authorize the FERC to regulate the securities issuances of those companies. Further, review of financial data in the context of certificate or rate proceedings is not the functional equivalent of requiring pre-issuance approval by FERC, and no FERC review is even required for short-term financing or financing unrelated to construction.

Plaintiffs insist that an inextricable connection exists between a company's rates, services and facilities, on the one hand, and its method of financing on the other. They conclude that regulation of securities issuance under Act 144 therefore creates an impermissible "prospect of interference with the federal regulatory power" over plans for financing, construction or extension of facilities under the NGA. Plaintiffs' own history of successful joint compliance with the NGA, the 1933 Act and Act 144 belies such an assertion. Unlike *Northern Natural Gas Co. v. Kansas Comm'n*, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963), on which plaintiffs rely, collision between Act 144 and the federal regulations is neither an inevitable consequence nor an "imminent possibility," such that Act 144 must be declared a nullity in order to assure effectuation of Congress' comprehensive federal regulations.

Furthermore, the legislative history and express terms of the NGA, as interpreted

---

**14.** The regulatory "gap" created by prior decisions was that between wholesales of natural gas in interstate commerce, strictly committed to exclusive federal regulation, and direct sales for consumptive uses. *See, Northern Natural Gas Co. v. Kansas Comm'n.*, 372 U.S. 84, 91, 83 S.Ct. 646, 650, 9 L.Ed.2d 601 (1963).

by the Supreme Court, reveal a calculated intent on the part of Congress to permit the coexistence of the NGA and existing state regulation, such that state regulatory power would not be handicapped or diluted in any way by the NGA. Finally, there may come a time when Congress determines that state securities regulation of natural gas companies is inconsistent with federal policy and appropriately seeks to amend the NGA to give the FERC or some other federal agency express and exclusive authority over such issuances. Until then, the "potential disruption" of which plaintiffs complain is purely hypothetical. Plaintiffs fear but can point to no instance where a security issuance presented to defendants prevented a FERC certified project from going forward. In fact, plaintiffs can point to no instance of actual disruption of FERC authority under the NGA by virtue of any of defendants' assertions of jurisdiction under Act 144.

As the Supreme Court observed in *Arkansas Elec. Coop. v. Arkansas Public Service Comm'n.*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983):

> "Maintaining the proper balance between federal and state authority in the regulation of electric and other energy utilities has long been a serious challenge to both judicial and congressional wisdom. On the one hand, the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States ... On the other hand, the production and transmission of energy is an activity particularly likely to affect more than one State, and its effect on interstate commerce is often significant enough that uncontrolled regulation by the States can patently interfere with broader national interests." (Citations omitted) *Id.*, at 377, 103 S.Ct. at 1908–09.

> \* \* \* \* \* \*

> "There may come a time when the REA changes its present policy, and announces that state rate regulation of rural power cooperatives is inconsistent with federal policy ... We will not,

however, in this facial challenge to the PSC's mere assertion of jurisdiction, assume that such a hypothetical event is so likely to occur as to preclude the setting of any rates at all." (Citations omitted) *Id.*, at 389, 103 S.Ct. at 1915.

On the record before me, I am similarly unwilling, on this facial challenge to the defendants' mere assertion of jurisdiction under Act 144, to assume that the "potential disruption or interference" which plaintiffs fear is so likely to occur as to preclude any regulation of securities issuances under Act 144 at all. I conclude that compliance with both federal and state regulations is not a physical impossibility, and Act 144 does not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Accordingly, I hold that regulation of securities issuance under Act 144 is not preempted by federal law.

### 2. *Commerce Clause Claims*

■ The power of the States to impose burdens on or interfere with interstate commerce is impliedly limited by the Commerce Clause. *Western & Southern Life Insurance Co. v. Board of Equalization*, 451 U.S. 648, 652, 101 S.Ct. 2070, 2074, 68 L.Ed.2d 514 (1981). Whether state regulation exceeds Commerce Clause limitations is determined by a "balance-of-interests" approach reformulated and expressed in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

> "Where [a] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well

with a lesser impact on interstate activities." (Citations omitted)

The *Bruce Church* test, explicitly endorsed as the modern jurisprudential approach to Commerce Clause questions, gives state regulation more latitude than earlier formalistic, "bright-line" approaches. *Arkansas Elec. Coop.*, 461 U.S. at 390, 103 S.Ct. at 1915.

The initial inquiry under *Bruce Church* involves the nature of the local public interest(s) served by the regulation. The Michigan Supreme Court discussed those interests in two cases consolidated for hearing and argument: *Michigan Gas Storage Co. v. MPSC*, 405 Mich. 376, 275 N.W.2d 457 (1979), and *Indiana & Michigan Power Co. v. State of Michigan*, 405 Mich. 400, 275 N.W.2d 450 (1979). It concluded that regulation of securities issuances under Act 144 was motivated "by the evils and injurious effects on the public of overcapitalization," and "was intended to, and does, protect interests which rate regulation alone could not effectively control." *Indiana & Michigan Power Co.*, 275 N.W.2d at 453.

> "Proper securities regulation serves the interests of the ratepayers in assuring continued service without interruption from utilities and in receiving that service at reasonable rates. For example, physical property of a company within the state, essential to the company's ultimate service to the public, could be jeopardized by inadequate financing, resulting in a failure in that service. We see no reason to conclude that Legislature would have intended to forego participation in regulating matters affecting interests with respect to which the state may properly exercise its protective powers because it is not also regulating other aspects of the business."

*Michigan Gas Storage Co.*, 275 N.W.2d at 462.

> "It serves the interests of both the investors in, and creditors of, a company organized and operating and issuing securities under the law of this state and those of ratepayers in efficient and uninterrupted service at reasonable rates."

*Indiana & Michigan Power Co.*, 275 N.W.2d at 453.

It is true, as plaintiffs point out, that both of these cases are factually distinguishable from the case at bar. However, those factual differences, while deserving discussion, do not, I believe, alter the applicability of the Michigan Supreme Court's conclusions to the case before the court.

Michigan Gas Storage Co. was a Michigan corporation and a wholly owned subsidiary of Consumers Power Company, a Michigan public utility. Michigan Gas Storage purchased natural gas in interstate commerce and sold all of it to Consumers Power. Consumers then sold the natural gas at retail to the public. Michigan Gas Storage Company had no facilities or significant assets outside Michigan and there was no evidence on whether or how much, if any, of the gas it sold to Consumers Power was ultimately consumed outside the State. Indiana & Michigan Power Company was also a Michigan corporation organized solely to acquire, complete construction of and operate the Donald C. Cook Nuclear Electricity Generating Plant and to sell the electricity generated thereby to its parent, Indiana & Michigan Electric Company, an Indiana corporation, which then sold the electricity retail in Michigan and Indiana. All of Indiana & Michigan Power Company's facilities and assets were located in Michigan and its sales to the parent company occurred strictly intrastate.

In the case at bar, Storage Company's operations, facilities and assets are all located in Michigan. It is a Michigan corporation. Although all of its gas storage customers are located outside Michigan, the service contracts with those customers are usually negotiated in Michigan. Power Company, although not a Michigan corporation, operates 15 gas storage fields and close to 800 miles of gas transmission pipelines and associated equipment in Michigan. In 1983, over 50% of its sales were within the State of Michigan. Its pipelines entering the State of Michigan connect with the State's primary local gas distribution utili-

ties which then sell the gas at retail to the consuming public.

I am satisfied that the Michigan Supreme Court's conclusions in *Michigan Gas Storage Co.* and *Indiana & Michigan Power Co.* are properly applicable to this case, given these strong Michigan connections. The same local public interests are served by regulation of plaintiffs under Act 144 as were served by regulation of Michigan Gas Storage Company and Indiana & Michigan Power Company in the two cited cases. A financial failure of either Storage Company or Pipeline Company due to overcapitalization would directly impact on this State, either upon the customers of the local gas distribution utilities who receive and resell Pipeline Company's gas, or those involved, directly or indirectly, with Storage Company's wholly intrastate storage facilities and operations. The pipelines and storage fields of both plaintiffs within Michigan affect private property rights of Michigan citizens. Inadequate financing, even if not resulting in failure of service, may result in inadequate maintenance of these intrastate facilities thereby posing potential safety threats to those living and working at or near plaintiffs' facilities. The mere fact that plaintiffs sell natural gas in interstate commerce, or contract for its storage solely with out-of-state customers, does not render the state powerless to regulate any of their activities where local public interests such as those listed above are served by the regulation.

The next inquiry under *Bruce Church* involves the nature of the state regulation and the degree to which it burdens interstate commerce. Act 144's applicability is limited to long-term offerings, specifically exempting short-term borrowings from MPSC approval under Act 144.[15] Accordingly, plaintiffs may issue notes payable at periods of 24 months or less without securing MPSC approval, and may do so pending action on an application for a long-term securities issuance. This option minimizes if not altogether eliminates potential impairment of plaintiffs' ability to raise necessary capital.

The authority of the MPSC under Act 144 is expressly limited to ascertaining whether the funds derived from the issue are to be applied to lawful purposes and whether the issue and amount are essential to the successful accomplishment of the purpose, or that the issue fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized. Once the MPSC has satisfied itself to such effect, it must authorize the issuance.[16] Although the MPSC has discretion to impose reasonable terms and conditions on the grant of authority,[17] every application of plaintiffs since 1979 has received unconditional approval from the MPSC. Further, I am satisfied that defendants' discretion under Act 144 is sufficiently circumscribed so as to minimize, if not eliminate, the likelihood of arbitrary decisions based on purely parochial concerns. Act 144 appears to regulate evenhandedly. Any burden imposed on interstate commerce is equally imposed on intrastate commerce.

As previously discussed, the average delay beyond the automatic 20 day effective period for registration statements under

---

**15.** M.C.L.A. § 460.301(4), M.S.A. § 22.101(4), provides, in pertinent part:

"A ... corporation ... may issue notes for lawful purposes, payable at periods of not more than 24 months, without authority from the commission ..."

**16.** M.C.L.A. § 460.301(3), M.S.A. § 22.101(3), provides, in pertinent part:

"If from the application filed and other information obtained from the investigation authorized in this act the commission is satisfied that the funds derived from the issue of stocks, bonds, or notes are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes, or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized, the commission *shall* grant authority to make the issue. In granting the authority, the commission may impose as a condition of the grant reasonable terms and conditions that the commission considers proper." (Emphasis added.)

**17.** *Id.*

federal Act of 1933 is approximately three weeks or less, according to plaintiffs' history of applications before the MPSC. No evidence has been presented that any FERC certification or rate proceeding has ever been disrupted or affected by defendants' proceedings under Act 144. Neither have plaintiffs presented any evidence that the average three week delays in securing MPSC approval on their applications have ever adversely affected either the cost or the overall marketability of any of plaintiffs' securities issues.

What the record reveals is an evenhanded and relatively limited state regulation which, as applied to plaintiffs, has historically had an indirect and minimal effect on interstate commerce. In light of the legitimate local public interests previously identified, this is not a regulation which violates Commerce Clause principles under the *Bruce Church* analysis.

Plaintiffs next argue that the regulation must be invalidated on a "uniformity" analysis. State regulation of interstate commerce has been held constitutionally impermissible where the subject matter requires national uniformity for that commerce to function. *Morgan v. Commonwealth*, 328 U.S. 373, 377, 66 S.Ct. 1050, 1053, 90 L.Ed. 1317 (1946). Plaintiffs claim that national uniformity in regulation of natural gas company securities issues is necessary because of potentially conflicting multi-state regulation and the potential disruptive effect if every state in which plaintiffs conducted business adopted regulations similar to Act 144. Although there are various state supreme court cases supporting this position, those cases involve challenges to similar state statutes as applied to companies with minimal local interests compared to those of plaintiffs in this case.

In *United Air Lines, Inc. v. Nebraska State Railway Commission*, 172 Neb. 784, 112 N.W.2d 414 (1961), and *United Air Lines, Inc. v. Illinois Commerce Comm'n.*, 32 Ill.2d 516, 207 N.E.2d 433 (1965), two of the cases relied upon by plaintiffs, minimal percentages (.45% and .90–1.36%, respectively) of United's overall route miles where within the borders of Nebraska and Illinois. Less than 1% of United's property was located in Nebraska, and although United, a Delaware corporation, had its executive offices in Illinois, its central operating base and chief overhaul bases were located in other states. As of 1965, United's interstate system served 32 states, the District of Columbia, and Canada, and 80% of its operations were interstate. In *Panhandle Eastern Pipeline v. Public Util. Comm'n.*, 56 Ohio St.2d 334, 383 N.E.2d 1163 (1978), Panhandle, a Delaware corporation, purchased, transported and sold natural gas in interstate commerce. Less than .35% of its overall gas sales by volume were accounted for in Ohio and 4.9% of its transmission pipeline was located in Ohio. In *Western Union Telegraph Company v. Public Service Comm'n.*, 127 Mich.App. 88, 338 N.W.2d 731 (1983), Western Union, a Delaware corporation with principal offices in New Jersey, derived only 5 to 7% of its revenues from intrastate operations and only 1.8% of its plant investment was located in Michigan. Western Union's interstate system served all 50 states. The *Western Union* court, although conceding that Act 144's underlying interests were substantial, found, as applied to the case before it, that those local interests were only "incidentally involved, if involved at all." Similar "as applied" analyses form the basis for the findings in the *United* and *Panhandle* cases. In each instance, the nature and percentage of the companies' business in the forum state was minimal enough so that, when balanced against the adverse effects to interstate commerce, the states' interests justifiably lost out.

By contrast, the local interests in the case at bar cannot be characterized as "only incidentally involved." One hundred percent of Storage Company's physical plant investment is located in Michigan, and it is a Michigan corporation. Over 72% of the gas Pipeline Company sold during 1983 went to its three largest customers, MCGC, Wisconsin Gas Company and Wisconsin Natural Gas Company. Over 50% of

Pipeline Company's 1983 sales were in Michigan, approximately 45% in Wisconsin and less than 5% in other states. As of 1983, Pipeline Company had plant investments in 17 states, including Michigan. The net plant investment in Michigan was $309,491,427.00. Louisiana, the state with the next highest plant investment, showed a comparative net investment of only $160,776,399.00. Only federal waters contain a net plant investment ($241,455,320.00) anywhere near the size of that located in Michigan.[18] As to Storage Company, no other state has any interest which would justify regulation. As to Pipeline Company, only Wisconsin has interests approaching those of Michigan. Plaintiffs have, accordingly, failed to convince me that national uniformity in the regulation of natural gas company securities issues is necessary, on the record before me, to avoid a potentially chaotic situation due to multi-state regulation.

Finally, plaintiffs have also failed to convince me that application of Act 144 to plaintiff companies otherwise so materially and unreasonably burdens interstate commerce as to be invalid under the Commerce Clause of the U.S. Constitution. As I have already indicated, substantial, legitimate state interests are served by Act 144 regulation. Act 144 regulates evenhandedly. It does not favor local commerce over out-of-state commerce, and imposes no burden on interstate commerce that it does not also impose on intrastate commerce. The record satisfies me that its effects on interstate commerce are not clearly excessive in relation to the putative local benefits served by regulation. In short, this statutory scheme cannot be said to impose an impermissible burden on interstate commerce.

III. CONCLUSION

For the reasons stated above, I hold that Act 144 regulation of plaintiffs' securities issuances is not preempted by federal law and does not violate the Commerce Clause of the United States Constitution.

18. See Appendix to Stipulation of Facts, Tab No. 7.