# SCHNEIDEWIND ET AL. *v.* ANR PIPELINE CO. ET AL.

No. 86–986.   Argued November 2, 1987—Decided March 22, 1988

BLACKMUN, J., delivered the opinion of the Court, in which all other Members joined, except KENNEDY, J., who took no part in the consideration or decision of the case.

*Don L. Keskey,* Assistant Attorney General of Michigan, argued the cause for petitioners. With him on the briefs were *Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Thomas L. Casey,* Assistant Solicitor General, and *Henry J. Boynton,* Assistant Attorney General.

*Howard J. Trienens* argued the cause for respondents. With him on the brief were *Rex E. Lee, Carter G. Phillips, John C. Jones,* and *Fredric N. Goldberg.* *

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the Court once again with a question concerning a State's ability to regulate the activities of natural gas companies.

---

*Briefs of *amici curiae* urging reversal were filed for the Council of State Governments et al. by *Benna Ruth Solomon, Beate Bloch, Marcia E. Carpeni,* and *Robert F. Shapiro;* and for the National Association of Regulatory Utility Commissioners by *William Paul Rodgers, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the Interstate Natural Gas Association of America by *Raymond N. Shibley, M.`Reamy Ancarrow,* and *John H. Cheatham III;* and for the Legal Foundation of America by *Jean Fleming Powers* and *David Crump.*

## I

Respondents ANR Pipeline Company (Pipeline) and ANR Storage Company (Storage) are wholly owned subsidiaries of American Natural Resources Company (Resources), a Delaware corporation which, like Pipeline and Storage, has its principal place of business in Michigan. Both Pipeline and Storage are natural gas companies, within the meaning of the Natural Gas Act of 1938 (NGA or Act), ch. 556, 52 Stat. 821, as amended, 15 U. S. C. § 717 *et seq.*[1] Thus, both are subject to the jurisdiction of the Federal Energy Regulatory Commission (FERC), the regulatory body charged with implementation of the NGA. See § 1(b) of the Act, 15 U. S. C. § 717(b).[2]

Pipeline is a Delaware corporation that owns and operates an interstate natural gas pipeline system transporting gas, exclusively for resale, to 51 gas distribution centers in Michigan and eight other States, where the gas is either delivered to customers of Pipeline or stored for future delivery. Pipe-

---

[1] " 'Natural-gas company' means [an individual or a corporation] engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." §§ 2(6) and (1) of the NGA, 15 U. S. C. §§ 717a(6) and (1).

Petitioners argued below that Storage was not a natural gas company within the meaning of the NGA, contending that the storage of gas constitutes neither the transportation nor the sale of gas in interstate commerce. Both courts below rejected this argument, see 627 F. Supp. 923, 925–926 (WD Mich. 1985), and 801 F. 2d 228, 230, n. 3 (CA6 1986), reasoning that "transportation" includes storage. " 'Underground gas storage facilities are a necessary and integral part of the operation of piping gas from the area of production to the area of consumption.' " *Ibid.*, quoting *Columbia Gas Transmission Corp.* v. *Exclusive Gas Storage Easement,* 776 F. 2d 125, 129 (CA6 1985), and 578 F. Supp. 930, 933 (ND Ohio 1983). We agree. Petitioners, in any event, do not press the point here.

[2] By the NGA, "Congress undertook to establish federal regulation over most of the wholesale transactions of electric and gas utilities engaged in interstate commerce, and created the Federal Power Commission . . . (now the Federal Energy Regulatory Commission) . . . to carry out that task." *Arkansas Elec. Coop. Corp.* v. *Arkansas Public Serv. Comm'n,* 461 U. S. 375, 378 (1983).

line purchases its natural gas from producers in Texas, Oklahoma, Kansas, Louisiana, and Wyoming.

Storage, which operates independently from Pipeline, is a Michigan corporation organized by Resources in 1978 to develop and operate gas storage reservoirs for nonaffiliated customers. Storage receives gas from outside Michigan and, on demand, redelivers it for sale outside that State. Storage operates four storage fields in Michigan.

Petitioners are members of the Michigan Public Service Commission (MPSC). Under Michigan's Public Utilities Securities Act, 1909 Mich. Pub. Acts No. 144, as amended (Act 144), Mich. Comp. Laws Ann. § 460.301 *et seq.* (1967 and Supp. 1987),[3] a public utility exercising or claiming the right

---

[3] Act 144 provides in relevant part:

"Sec. 1. (1) . . . [A] corporation, association, or individual exercising or claiming the right to carry or transport natural gas for public use, directly or indirectly, . . . by or through a pipeline or engaged in the business of piping or transporting natural gas for public use, directly or indirectly, or engaged in the business of purchasing natural gas for distribution may issue stocks, bonds, notes, or other evidences of indebtedness payable at periods of more than 12 months after the date of issuance, if necessary for the acquisition of property, the construction, completion, extension, or improvement of facilities or for the improvement or maintenance of service or for the discharge or lawful refunding of obligations and may issue stock to represent accumulated earnings invested in capital assets and not previously capitalized, if the Michigan public service commission issues an order authorizing the issue and the amount of the issue, and states that in the opinion of the commission the use of the capital or property to be acquired to be secured by the issue of the stock, bonds, notes, or other evidences of indebtedness, is reasonably required for the purposes of the person, corporation, or association, or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized. Approval of securities does not presume that the projects to be constructed or property to be acquired will be included in the company's rate base.

"(2) A person, corporation, or association desiring authority to issue stocks, bonds, notes, or other evidences of indebtedness shall make written application to the commission in the form as the commission requires. After receiving the application, the commission, for the purpose of determining whether the commission should grant the authority, may make an

to transport natural gas in Michigan for public use[4] must obtain MPSC approval before issuing long-term securities. Act 144 directs the MPSC to approve a security issuance

inquiry or investigation, hold hearings, and examine witnesses, books, papers, documents, or contracts the commission considers of importance in enabling it to reach a determination.   An interested person, including municipalities and organizations whose membership consists of a substantial number of ratepayers within the service area of the utility, shall have the right to intervene as provided in the rules of the commission . . . .

"(3) If from the application filed and other information obtained from the investigation authorized in this act the commission is satisfied that the funds derived from the issue of stocks, bonds, or notes are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes, or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized, the commission shall grant authority to make the issue.   In granting the authority, the commission may impose as a condition of the grant reasonable terms and conditions that the commission considers proper.

"(4) A person, corporation, or association may issue notes for lawful purposes, payable at periods of not more than 24 months, without authority from the commission; but the notes shall not in whole or in part, be refunded by an issue of stock or bonds or by an evidence of indebtedness running for more than 12 months without the consent of the commission.

"(5) This act shall apply to stock, shares, bonds, or notes issued to or taken by the incorporators or their agents, assigns, or trustees of a corporation or association in the first instance, and shall also apply to stock, bonds, or notes issued to or taken by the stockholders of the corporation or association, their agents, assigns, or trustees, after the first instance.

"(8) This act shall not apply to a person, corporation, or association which is engaged in the business of carrying, transporting, piping, purchasing for distribution, or selling natural gas into this state, which derives less than 5% of its consolidated gross revenues from all of its operations from natural gas operations in this state, and which does not offer residential natural gas service to the general public under rules promulgated by the Michigan public service commission."   Mich. Comp. Laws Ann. § 460.301 (Supp. 1987).

[4] Subsection (8) of Act 144 provides, however, see n. 3, *supra*, that the Michigan statute does not apply to a natural gas company that "derives less than 5% of its consolidated gross revenues from all of its operations from natural gas operations in [Michigan]."

when it "is satisfied that the funds derived . . . are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes, or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized." § 460.301(3). The MPSC may conduct an investigation, including an appraisal of the company's property at the company's expense, in deciding whether to allow the issue, § 460.301(2), and it "may impose as a condition of the grant reasonable terms and conditions that [it] considers proper." § 460.301(3).

Pipeline and Storage filed in the United States District Court for the Western District of Michigan an amended complaint against petitioners in their official capacities, seeking a declaratory judgment that the MPSC lacks jurisdiction over their security issuances and thus that they may lawfully issue and market securities without MPSC approval.[5] Respondents argued that Act 144 was pre-empted by the NGA and that Act 144 violates the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3.

The District Court concluded that Act 144 was neither pre-empted by the federal regulatory scheme nor in violation of the Commerce Clause. 627 F. Supp. 923 (WD Mich. 1985). On the pre-emption issue, the court concluded that "compliance with both federal and state regulations is not a physical impossibility, and Act 144 does not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id., at 930. As to the Commerce Clause, the court concluded that Act 144 was "an evenhanded and relatively limited state regulation which, as applied to [respondents], has historically had an indirect and minimal ef-

---

[5] The parties agreed that the District Court should decide the case on the basis of a stipulation of facts, an appendix thereto, respondents' answers to three sets of interrogatories, and respondents' replies to two sets of requests for admissions. 627 F. Supp. 923 (WD Mich. 1985).

fect on interstate commerce," while serving legitimate local interests. 627 F. Supp., at 933.

The United States Court of Appeals for the Sixth Circuit reversed, holding that both the pre-emptive effect of the federal regulatory scheme and the Commerce Clause bar application of Act 144 to respondents. 801 F. 2d 228 (1986). The Court of Appeals concluded that Act 144 was pre-empted because, by omitting any requirement of advance approval of the issuance of securities "in an otherwise 'comprehensive' regulatory scheme, Congress has implicitly determined that the States should not impose such regulations," 801 F. 2d, at 233–234, and because of the possibility of a conflict between federal and state regulation of natural gas company projects and financing plans, id., at 235–236. Furthermore, the court reasoned, inasmuch as "the burdens of expense, delay, and administrative hassle of 'advance approval' securities regulation far outweigh the benefits, if any, of Michigan's interests in protecting consumers and investors . . . Act 144 unconstitutionally burdens interstate commerce." Id., at 238.

Because of a conflict between the views of the Sixth Circuit and those of the Michigan Supreme Court set forth in *Michigan Gas Storage Co.* v. *Michigan Pub. Serv. Comm'n*, 405 Mich. 376, 275 N. W. 2d 457 (1979), we granted certiorari to decide whether Michigan may require respondents to obtain MPSC approval before issuing and marketing securities.

## II

The circumstances in which federal law pre-empts state regulation are familiar. See *Arkansas Elec. Coop. Corp.* v. *Arkansas Public Serv. Comm'n*, 461 U. S. 375, 383 (1983). See also *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 152–154 (1982). A pre-emption question requires an examination of congressional intent. *Id.*, at 152. Of course, Congress explicitly may define the extent to which its enactments pre-empt state law. See, *e. g., Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 95–96 (1983). In the

absence of explicit statutory language, however, Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law. Such a purpose properly may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where "the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal the same purpose." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). Finally, even where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law. Such a conflict will be found "'when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941).'" *California Coastal Comm'n* v. *Granite Rock Co.*, 480 U. S. 572, 581 (1987), quoting *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 248 (1984).

In this case we conclude that Act 144 regulates in a field the NGA has occupied to the exclusion of state law, and that it therefore is pre-empted.

## III

### A

The NGA long has been recognized as a "comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.'" *Northern Natural Gas Co.* v. *State Corporation Comm'n of Kansas*, 372 U. S. 84, 91 (1963), quoting *Phillips Petroleum Co.* v. *Wisconsin*, 347 U. S. 672, 682 (1954).[6] The NGA confers upon FERC ex-

---

[6] The Natural Gas Policy Act of 1978 (NGPA), 92 Stat. 3351, 15 U. S. C. § 3301 *et seq.*, did not compromise the comprehensive nature of federal regulatory authority over interstate gas transactions. *Transcontinental Gas*

clusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale. *Northern Natural Gas Co.*, 372 U. S., at 89. FERC exercises authority over the rates and facilities of natural gas companies used in this transportation and sale through a variety of powers. Sections 4, 5, and 7 of the NGA, as amended, 15 U. S. C. §§ 717c, 717d, and 717f, give FERC a number of tools for examining and controlling the issuance of securities of natural gas companies in the exercise of its comprehensive authority.

First, in exercising its authority to determine a "just and reasonable" rate for the transportation or sale of natural gas subject to its jurisdiction, FERC may conduct hearings and undertake a detailed examination of a company. § 4 of the NGA, as amended, 15 U. S. C. § 717c. For example, to calculate a reasonable rate of return on invested capital, FERC examines a company's capital structure (the percentages of its capital that come from debt, common stock, and preferred stock), establishes the rate of return allowable on each type of capital, and determines an overall rate of return as a weighted average, in accordance with the amount of each kind of capital. *Public Service Comm'n of New York* v. *FERC*, 259 U. S. App. D. C. 86, 96, 813 F. 2d 448, 458 (1987). Thus, a natural gas company's capital structure is related directly to the rates FERC allows it to charge. When a company's "equity ratio moves beyond generally accepted limits," however, FERC may calculate a company's rates on an imputed "reasonable capital structure" rather than on the actual structure. *Alabama-Tennessee Natural Gas Co.*, 38 FERC ¶ 61,251, p. 61,849, aff'd in relevant

---

*Pipe Line Corp.* v. *State Oil and Gas Bd. of Mississippi*, 474 U. S. 409, 420–421 (1986). See *Arkansas Louisiana Gas Co.* v. *Hall*, 453 U. S. 571, 580 (1981). The enactment of the NGPA reflected a congressional belief that a different system of natural gas pricing was needed to balance supply and demand. *Transcontinental Gas*, 474 U. S., at 421. The changes the NGPA wrought in FERC's authority have no bearing on the outcome of this case.

part on rehearing, 40 FERC ¶61,244, pp. 61,813–61,816 (1987). Thus, FERC exercises its ratemaking authority to limit the burden on ratepayers of abnormally high equity ratios. See, *e. g., Tarpon Transmission Co.*, 41 FERC ¶61,044 (1987). In addition, this power effectively permits FERC to control, albeit indirectly, a natural gas company's capital structure. FERC's power to prevent an overcapitalized company from financing its equity through inflated rates presumably acts as a strong deterrent to the development of such a capital structure.

Second, a natural gas company must obtain from FERC a "certificate of public convenience and necessity" before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce. § 7(c)(1)(A) of the NGA, as amended, 15 U. S. C. § 717f (c)(1)(A). FERC will grant the certificate only if it finds the company able and willing to undertake the project in compliance with the rules and regulations of the federal regulatory scheme. § 7(e), as amended, 15 U. S. C. § 717f(e). FERC may attach "to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." *Ibid.* In fulfilling this statutory duty, FERC has promulgated extensive regulations that require a statement of the plans for financing a proposed facility and a detailed description of any proposed securities issuance. 18 CFR § 157.14(14) (1987).[7] FERC, like the Federal Power Com-

---

[7] This required disclosure includes:

"(i) A detailed description of applicant's outstanding and proposed securities and liabilities . . . .

"(ii) The manner in which applicant proposes to dispose of securities . . . ; the persons, if known, to whom they will be sold . . . and if not known, the class or classes of such persons.

"(iii) A statement showing for each proposed issue, by total amount and by unit, the estimated sale price and estimated net proceeds to the applicant.

mission, its predecessor, has not hesitated to use its certification power to ensure that a project is financed in accordance with the public interest.[8]

"(vi) Statement of anticipated cash flow, including provision during the period of construction and the first 3 full years of operation of proposed facilities for interest requirements, dividends, and capital retirements.

"(vii) Statement showing, over the life of each issue, the annual amount of securities which applicant expects to retire through operation of a sinking fund or other extinguishment of the obligation.

"(viii) A balance sheet and income statement (12 months) of most recent date available.

"(ix) Comparative pro forma balance sheets and income statements for the period of construction and each of the first 3 full years of operation, giving effect to the proposed construction and proposed financing of the project.

"(x) Conformed copies of all agreements, contracts, mortgages, deeds of trust, indentures, agreements to advance materials or supplies or render services in return for applicant's securities, underwriting agreements, and any other agreements or documents of a similar nature.

"(xi) Conformed copies of all reports, letters, or other documents, submitted by applicant to underwriters, insurance companies, or others regarding financing, including business studies, forecasts of earnings, and other similar financial or accounting reports, statements, or documents.

"(xii) Conformed copies of all applications and supporting exhibits, registration statements, or other similar submittals, if any, to the Securities and Exchange Commission, including all supplements, changes or modifications of the above.

"(xiii) Any additional data and information upon which applicant proposes to rely in showing the adequacy and availability to it of resources for financing its proposed project."   18 CFR § 157.14(14) (1987).

   [8] See *Trailblazer Pipeline Co.*, 18 FERC ¶ 61,244, p. 61,503 (1982) (certificate "conditioned on applicants' waiver of their right to apply for the recovery of their equity investment in this project should it fail"); *Midwestern Gas Transmission Co.*, 21 F. P. C. 653, 656 (1959) (certificate issued on condition that company pay no dividends on common stock until interim notes were converted into preferred stock, or total long-term debt was reduced to 75% or less of total capitalization).   Each of these opinions was amended on rehearing in ways not relevant here.   See 23 FERC ¶ 62,355 (1983), 26 FERC ¶ 61,068 (1984), and 34 FERC ¶ 62,016 (1986) relating to *Trailblazer*, and 30 F. P. C. 759 (1963) and 30 F. P. C. 1313 (1963) relating to *Midwestern*.

Third, FERC has various powers and obligations that both allow and require it to protect against the deleterious effects of ill-considered or improper securities issuances in this area. For example, officers and directors of natural gas companies are prohibited from profiting from the company's securities issues. See § 12, 15 U. S. C. § 717k. No company may abandon any service or facility without FERC approval, including a finding by FERC that either the available gas supply is depleted, or "the present or future public convenience or necessity permit such abandonment." § 7(b), 15 U. S. C. § 717f(b). A company must keep its accounts in accordance with FERC's Uniform System of Accounts and must submit those accounts for review as FERC deems necessary. §§ 8 and 10, 15 U. S. C. §§ 717g and 717i; 18 CFR pt. 201 (1987). Finally, FERC has the authority to examine and to change "any rule, regulation, practice, or contract affecting [rates that] is unjust, unreasonable, unduly discriminatory, or preferential." § 5(a), 15 U. S. C. § 717d(a).

Although the NGA gives FERC these substantial powers and obligations, it is also true, as petitioners remind us, that FERC is not expressly authorized to regulate the issuance of securities by natural gas companies. Of course, if such express authority were granted, pre-emption would be more apparent, given the comprehensive nature of FERC's authority. In the absence of an express provision, however, we must examine whether the preissuance review of securities in which Michigan engages amounts to a regulation in the field of gas transportation and sales for resale that Congress intended FERC to occupy.

## B

As an initial matter, respondents argue that Act 144 is pre-empted by the NGA because "[s]ecurities issuances used to finance the interstate sale and transportation of natural gas were clearly beyond the power of the states to control in 1938." Brief for Respondents 12. They premise this argument on this Court's statements that Congress intended, by

enacting the NGA, to cover areas of natural gas regulation that the States could not reach under the Court's "dormant" Commerce Clause decisions. See, *e. g., Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n of Indiana,* 332 U. S. 507, 514–516 (1947) (NGA covers sales for resale by interstate carriers; States regulate direct sales to consumers even though made by interstate carriers). Thus, if the Commerce Clause barred the States from a certain method of regulation when the NGA was enacted in 1938, respondents argue, that type of regulation was covered by the NGA and is now pre-empted. Our inquiry, however, is not so easily answered.

Even if Commerce Clause jurisprudence would have barred Act 144's regulation at the time of the enactment of the NGA, an issue never directly settled by the Court, that would not decide this case. The authorities on which respondents rely state only what is now well settled: Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce. See, *e. g., Illinois Gas Co.* v. *Central Illinois Public Service Co.,* 314 U. S. 498, 506–507 (1942). The question remains, however, whether Act 144 regulates *within* this exclusively federal domain. Furthermore, in the absence of an express statement in the NGA of an intent to pre-empt this kind of state law, respondents' syllogism may be flawed. "To the extent that Congress sought to freeze its perception of [the scope of constitutionally permissible state regulation] into law . . . it did so only as a means to accomplishing the end of workable federal regulation, not as an end in itself." *Arkansas Elec. Coop. Corp.* v. *Arkansas Public Serv. Comm'n,* 461 U. S., at 384, n. 8. If Congress did not intend a particular kind of federal regulation, pre-empting state regulation of that kind would not necessarily have served Congress' purpose. *Ibid.* An intent to pre-empt state regulation thus cannot be inferred from the mere fact that States were

precluded from such regulation at the time of the NGA's enactment.

Similarly, petitioners' reliance on Congress' subsequent failure to enact proposed legislation that would have given FERC explicit authority to regulate the issuance of securities of natural gas companies [9] deserves only passing mention. This Court generally is reluctant to draw inferences from Congress' failure to act. See, e. g., *American Trucking Assns., Inc.* v. *Atchison, T. & S. F. R. Co.*, 387 U. S. 397, 416–418 (1967); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 381, n. 11 (1969). Indeed, those Members of Congress who did not support these bills may have been as convinced by testimony that the NGA already provided "broad and complete . . . jurisdiction and control over the issuance of securities" as by arguments that the matter was best left to the States. See Hearings on H. R. 5306 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 81st Cong., 2d Sess., 53 (1950). Furthermore, even if, in enacting the NGA, Congress had decided to deny FERC access to a particular regulatory tool, it would not necessarily follow that Congress intended to allow the States the use of that tool. Congress may have determined that this particular form of regulation simply should not be employed. That authoritative federal determination would have full pre-emptive force. *Transcontinental Gas Pipe Line Corp.* v. *State Oil and Gas Bd. of Mississippi*, 474 U. S. 409, 422 (1986).

C

We turn then, to the crux of the issue: whether Act 144 is a regulation of the rates and facilities of natural gas companies used in transportation and sale for resale of natural gas in interstate commerce. Since we find that it is, we conclude that it is pre-empted.

---

[9] See, e. g., as introduced, H. R. 5306 and S. 2746, 81st Cong., 1st Sess. (1949); S. 1880, 84th Cong., 1st Sess., § 3 (1955).

As noted earlier, Act 144 allows the MPSC to examine a security issuance of a natural gas company to determine whether it is "to be applied to lawful purposes and . . . is essential to the successful carrying out of the purposes, [or] represents accumulated and undistributed earnings invested in capital assets and not previously capitalized." Mich. Comp. Laws Ann. § 460.301(3) (Supp. 1987). The Michigan Supreme Court has authoritatively construed Act 144 as designed to protect investors in the gas company's securities and to protect ratepayers. *Attorney General* v. *MPSC*, 412 Mich. 385, 402, 316 N. W. 2d 187, 193 (1982). By guarding against the "evils and injurious effects on the public of overcapitalization," *Indiana & Michigan Power Co.* v. *Public Service Comm'n*, 405 Mich. 400, 410, 275 N. W. 2d 450, 453 (1979), Act 144 both protects investors and ensures "efficient and uninterrupted service at reasonable rates." *Ibid.* It is our view, however, that when applied to natural gas companies, Act 144 amounts to a regulation of rates and facilities, a field occupied by federal regulation. The objectives sought by Act 144 are the same as those sought by the NGA.

Petitioners argue that, without Act 144, a company could take on so much debt through securities issuances that it would lack the resources to maintain its Michigan facilities properly. This could threaten the supply of gas to Michigan consumers, petitioners argue, lead to a rate increase, or hurt investors in the company. In another scenario, a company might take on more equity than it needs, requiring it to charge higher rates (because equity usually requires a higher rate of return). Petitioners also explain that Act 144 protects against overcapitalization in the sense of a lack of correlation between a company's capital stock and the value of its property. An imbalance in this respect, petitioners argue, could also threaten the supply of gas at reasonable rates.[10]

---

[10] It is perhaps worthy of note that the purported purposes of Act 144, as applied to respondents, appear highly artificial at best. Storage does not

Each of these uses of Act 144, however, is an attempt to regulate matters within FERC's exclusive jurisdiction. By keeping a natural gas company from raising its equity levels above a certain point, Michigan seeks to ensure that the company will charge only what Michigan considers to be a "reasonable rate." This is regulation of rates. The other aim of Act 144, seeking to ensure that a company is financed in a way that will allow proper maintenance of its facilities and continuance of its services, for the benefit of both ratepayers and investors, also falls within FERC's exclusive purview since those facilities are a critical part of the transportation of natural gas and sale for resale in interstate commerce. In short, the things Act 144 regulation is directed at, the control of rates and facilities of natural gas companies, are precisely the things over which FERC has comprehensive authority.[11]

Of course, every state statute that has some indirect effect on rates and facilities of natural gas companies is not preempted. Cf. *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724, 753–756 (1985). Act 144's effect, however, is not "indirect." In this case we are presented with a state

---

serve any Michigan consumers. Thus, it is hard to see what effect regulation of Storage could have on the supply of gas at reasonable rates to Michigan consumers. As to investors, since respondents issue their securities on international and national financial markets, Michigan investors are involved with these issuances only to the extent they operate and invest through these markets. Thus, even petitioners must concede that Michigan investors probably will never own more than a small percentage of respondents' outstanding securities.

[11] Of course, one area FERC does not exclusively control is "securities regulation" in the traditional sense of the term, *i. e.*, protection of investors from fraudulent or deceptive issuances. Michigan has an interest in guarding against the sale of such securities in Michigan. To this end, Michigan, like many other States, has a "blue sky" law that governs the registration and sale of securities sold within the State. See Mich. Comp. Laws Ann. § 451.701 *et seq.* (1967 and Supp. 1987). While such traditional "securities regulation" is not FERC's direct concern, Act 144 is not that kind of regulation. Act 144 applies only to utilities and is not limited to securities sold within Michigan.

law whose central purpose is to regulate matters that Congress intended FERC to regulate. Not only is such regulation the function of the federal regulatory scheme, but the NGA has equipped FERC adequately to address the precise concerns Act 144 purports to manage. As reviewed above, FERC can control potential instances of overcapitalization, and its effects on both ratepayers and investors, by its regulation of rates. To the extent that Act 144 is directed at "overcapitalization" in the sense of a lack of correlation between a company's capital stock and the value of its property, FERC directly monitors the same matter through its accounting requirements. As to natural gas companies that threaten the continued supply of gas by seeking to finance their operations through excessive debt, FERC may prevent such problems through its certification power. Indeed, as discussed above, FERC's detailed examination of a company's finances includes review of security issuances involved in financing new facilities.[12] In addition, FERC has its power to prevent abandonments. Finally, FERC's authority to regulate and fix practices affecting rates allows the agency to address directly any unduly leveraged, unduly risky, or unduly capitalized investments.

Thus, while the NGA does not expressly grant FERC pre-issuance authority over the securities of natural gas companies, FERC achieves the regulatory ends of such review with regard to rates and facilities through the exercise of its express regulatory responsibilities.

---

[12] Normally, regulations do not pre-empt state authority unless they declare their intent to do so with "some specificity." See *California Coastal Comm'n* v. *Granite Rock Co.*, 480 U. S. 572, 583 (1987). These regulations are indicative, however, of the broad powers FERC has at its disposal in regulating natural gas companies, and thus the extent to which Act 144 intrudes on a field of regulation that federal legislation has occupied. See *R. J. Reynolds Tobacco Co.* v. *Durham County*, 479 U. S. 130, 148–149 (1986); but cf. *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 717 (1985).

## D

Our conclusion that Act 144 seeks to regulate a field that the NGA has occupied also is supported by the imminent possibility of collision between Act 144 and the NGA. See *Northern Natural Gas Co.* v. *State Corporation Comm'n of Kansas*, 372 U. S., at 91–93; *Maryland* v. *Louisiana*, 451 U. S. 725, 751 (1981). If the MPSC ever denied a natural gas company authority to issue a security under Act 144 for a FERC-approved project, the disagreement between state and federal authorities over the wisdom of the project and its proposed financing would interfere with the federal regulatory scheme. Furthermore, any state-ordered alteration in a company's capital structure would impinge on the federal ratemaking authority.

When a state regulation "affect[s] the ability of [FERC] to regulate comprehensively . . . the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act" or presents the "prospect of interference with the federal regulatory power," then the state law may be pre-empted even though "collision between the state and federal regulation may not be an inevitable consequence." *Northern Natural Gas Co.*, 372 U. S., at 91–92. Although hypothetical conflicts will not always show an intent to pre-empt state authority, see *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 237 (1947), this "imminent possibility" further demonstrates the NGA's complete occupation of the field that Act 144 seeks to regulate.

We therefore conclude that the MPSC regulation of respondents through Act 144 impinges on a field that the federal regulatory scheme has occupied and, consequently, that Act 144 is pre-empted.[13]

---

[13] Petitioners place much reliance on *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218 (1947), where this Court rejected a facial challenge to a state statute that regulated the securities issuances of grain warehouses in a fashion similar to the operation of Act 144. The Court reached its conclusion even though the United States Warehouse Act, 39 Stat. 486, as

## IV

Because we have concluded that Act 144 is pre-empted by the NGA, we need not decide whether, absent federal occupation of the field, Act 144 violates the Commerce Clause. See *Transcontinental Gas Pipe Line Corp.* v. *State Oil and Gas Bd. of Mississippi*, 474 U. S., at 425.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

---

amended, 7 U. S. C. § 241 *et seq.* (1946 ed.), through licensing provisions, regulated the facilities, rates, and services of grain warehouses. That case, however, involved a field of regulation that, unlike the regulation of natural gas company securities issuances, "the States ha[d] traditionally occupied." 331 U. S., at 230. Indeed, petitioners and their *amici* point to no State other than Michigan that has applied a regulation similar to Act 144 to natural gas companies engaged solely in activities subject to FERC's jurisdiction. Moreover, the United States Warehouse Act was not nearly so comprehensive as the NGA. Indeed, a warehouseman was not required to operate under the Act, *id.*, at 233, and even as to warehousemen who were licensed under the Act, the Secretary of Agriculture had made no attempt to regulate these matters, *id.*, at 237. In the words of the *Rice* Court: "The test . . . is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act." *Id.*, at 236. In the present case, Act 144 fails that test.