**SOUTHEASTERN FISHERIES ASSOCIATION, INCORPORATED, a Florida corporation, Glen Black, an individual, Plaintiffs–Appellees,**

v.

**Lawton CHILES, Governor, individually, and as Governor of Florida, Robert A. Butterworth, Attorney General, individually and as the Attorney General of Florida, Bob Crawford, individually and as Commissioner of Agriculture of**

the State of Florida, Jim Smith, individually and as Secretary of State for Florida, Tom Gallagher, individually and as State Treasurer and Insurance Commissioner, Betty Castor, individually and as the Commissioner of Education of the State of Florida, Ronald McCullers, Maj., individually and as supervisor of District IX Florida Marine Patrol, Gerald A. Lewis, individually and as State Comptroller, Defendants–Appellants,

Florida Conservation Association, Intervenor–Appellant.

No. 91–5721.

United States Court of Appeals, Eleventh Circuit.

Dec. 29, 1992.

Jonathan A. Glogau, Asst. Atty. Gen., Tallahassee, Fla., for defendants-appellants.

David G. Guest, Sierra Club Legal Defense Fund, Tallahassee, Fla., for Intervenor–Florida Conservation Ass'n.

Brian E. Berwick, Office of Atty. Gen. of Texas, Austin, Tex. and Michael J. Bowers, Georgia, Dept. of Law, Atlanta, Ga., for amicus, Atty. Generals.

Laurie Fowler, Environmental Law Ass'n, Georgia Law Review, University of Georgia School of Law, Curtis G. Shoemaker, Athens, Ga., for amicus, Environmental Law Ass'n.

David Paul Horan, Horan Horan & Esquinaldo, Key West, Fla., for plaintiffs-appellees.

David C. Shilton, John A. Bryson, and J. Carol Williams, Dept. of Justice, Environmental & Natural Resources Div., Washington, D.C., for the U.S. amicus in support of defendants-appellants.

Before TJOFLAT, Chief Judge and FAY and COX, Circuit Judges.

FAY, Circuit Judge:

Officials of the State of Florida and the Florida Conservation Association, the defendants, appeal the district court's order granting summary judgment for Southeastern Fisheries Association, Inc. and Glen Black, the plaintiffs. The district court permanently enjoined enforcement of the Florida Administrative Code, Chapter 46–23, outside of state territorial waters and held the regulations unconstitutional as violations of the Supremacy Clause, the Equal Protection Clause and the Commerce Clause. The challenged regulations limit the number of pounds of Spanish Mackerel that a commercial vessel can bring into a Florida port on any given day. The district court found these limits directly conflicted with federal regulations promulgated pursuant to the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.* (1976). We believe the Florida regulations probably are preempted by and also directly conflict with the Magnuson Act. The regulations also may run afoul of equal protection or interstate commerce jurisprudence. We do not have sufficient facts, however, to review the district court's order. We, therefore, VACATE the order and REMAND for additional factual findings in support of the district court's opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

We recite the facts as found in the district judge's Final Order and Opinion.

During the morning of December 18, 1990, the State of Florida arrested Captain Glen Black, a Florida resident and commercial fisherman, for violating Chapter 46–23 of the Fla.Admin.Code.[1]

1. On November 1, 1989, Florida revised its landing limits to govern landings of fish caught in all waters. [Prior to this the state had in effect landing regulations which applied only to landings of fish caught in state waters. The pertinent regulations read as follows:]

46.23.004 Commercial Fishing Season for Spanish Mackerel; Commercial Vessel Limits.
(1) East Coast
  (a) East Coast Waters Defined ...
  (b) Persons harvesting Spanish Mackerel for commercial purposes from waters of the east coast shall have a season that begins on the regional opening date of April 1 of each year and continues through March 31 of the following year. These persons shall be subject to commercial vessel limits effective during segments of the season as follows:
  (1) A limit of 1,500 pounds per vessel per day shall apply from April 1 through November 30 of each year and also from the date unlimited harvest ends pursuant to subparagraph 2, until the date the total regional commercial harvest is projected to reach 2,600,000 pounds. During the 1,500 pound season segments, no person shall land from a single

Chapter 46–23 is a Florida landing law concerning the harvesting of Spanish Mackerel outside the state's territorial waters. Captain Black used his boats to catch over 10,000 pounds of Spanish Mackerel in the federal waters of the Gulf of Mexico.[2] The fish were caught pursuant to a federal permit.

[Captain Black and Southeastern Fisheries Association] commenced this action seeking declaratory and injunctive relief against state officials in charge of enforcing and placing into effect Chapter 46–23, Fla.Admin.Code. As it now stands, both Florida and the federal government have enacted statutes and regulations to regulate fishing in the region.

Some time ago, Congress enacted the Magnuson Fishery Conservation and Management Act (Magnuson Act), 16 U.S.C. § 1801 *et seq.* (1976). The Magnuson Act established an Exclusive Economic Zone (EEZ) (formerly known as the Fishing Conservation Zone) in the waters off the United States coastline. The EEZ runs from the outer limits of state territorial waters to 200 nautical miles seaward. *Id.* [at] § 1811. All fish except highly migratory species are subject to the exclusive fishery management authority of the United States.

In addition, the Magnuson Act establishes eight regional fishery management councils and provides that management of fishery resources within each region shall be conducted pursuant to fishery management plans prepared by each council or councils for each species of stock of fish within its region. *Id.* [at] § 1852. States continue to regulate fishing out to the seaward limit of state territorial waters. The Magnuson Act does provide, however, that " ... the states cannot regulate, directly or indirectly, any fishing vessel outside their respective territorial borders, unless the vessel is registered under the laws of that state." [*Id.* at] § 1856(a)(3).

The responsibility for developing fishery management plans for Spanish Mackerel [is] vested in the Gulf of Mexico and the Atlantic Fishery Management Councils [the Council]. The Coastal Migratory Pelagic Resources Fishery Management Plan [the FMP] was developed by joint effort of the Gulf and Atlantic Councils. This particular [FMP] specifically sets an annual quota for total catch of Spanish Mackerel. The quota covers a wide range of territory.[3] Notably, the majority of Spanish Mackerel are taken in federal waters off the coast of Florida. The Florida regulation limits a fishing vessel landing in Florida to a sliding scale of Spanish Mackerel pounds per trip. Chapter 46–23 is an attempt to regulate fishery management activities

---

vessel in any one day within this region more than 1,500 pounds of Spanish Mackerel. The term Land for purposes of this subparagraph and subparagraph 3 means the physical act of bringing the harvested fish ashore.

(2) Unlimited harvest of Spanish Mackerel per vessel per day shall be allowed from December 1 of each year until the date the total regional commercial harvest is projected to reach 2,340,000 pounds.

(3) A limit of 500 pounds per vessel per day shall apply after the date the total regional commercial harvest is projected to reach 2,600,000 pounds and continue through the remainder of the season (March 31). During this season segment, no person shall land from a single vessel in any one day within this region more than 500 pounds of Spanish Mackerel.

(4) Notwithstanding subparagraphs and 2 [sic], if at any time during the season, adjacent federal Exclusive Economic Zone (EEZ) waters are closed to commercial harvest of Spanish Mackerel, the commercial vessel limit and landing limit of 500 pounds per vessel per day specified in subparagraph 3 shall apply for the remainder of the season.
Chapter 46–23.004, Fla.Admin.Code.
Similar regulations were enacted for the East, Southwest, and Northwest coasts of Florida.

2. We presume the catch complied with federal regulations.

3. Pursuant to the Magnuson Act, the Council developed and the Secretary of Commerce approved, the FMP. The FMP provides for an annual quota for Spanish Mackerel caught in the EEZ. In the 1990–91 season the Gulf of Mexico quota was set at 2.99 million pounds with no landing limit. The Atlantic quota was slightly higher at 3.14 million pounds. The catch is taken off the coastal states from North Carolina to Texas. *See* 50 C.F.R. 642.21(c) (1991).

in the EEZ by placing [daily] limits on vessels registered and landing in Florida. R2–52–1.

. This case came before the district court upon the plaintiffs' objections to the magistrate's recommendations and factual findings. The magistrate found Chapter 46–23 (1) did not deny plaintiffs equal protection of law because the rules applied equally to all persons within Florida's jurisdiction; (2) did not impermissibly burden interstate commerce; and (3) was not preempted by federal regulations because Congress did not intend to occupy the field of fishery management in the EEZ,[4] and because the state regulations were consistent with the purposes of the federal regulations.[5]

The district judge rejected the magistrate's recommendations and held that Chapter 46–23 violates the Equal Protection, Commerce and Supremacy Clauses of the United States Constitution. Citing *Bateman v. Gardner,* 716 F.Supp. 595 (S.D.Fla.1989), *aff'd,* 922 F.2d 847 (11th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991), the ·district court held Florida impermissibly discriminated against its own citizens because the landing limits only prohibited citizens with vessels registered in Florida from reaching the federal annual quota of Spanish Mackerel. The court also held Chapter 46–23 would be an unauthorized interference with commerce between the states because it prohibits out-of-state vessels from using Florida ports to land otherwise legal cargos of fish.

In its final analysis, the district court held Chapter 46–23 preempted by the FMP. Under the FMP, Captain Black may take Spanish Mackerel up to 2.99 million pounds in the Gulf of Mexico and 3.14 million pounds in the Atlantic, while under the Florida regulation he may not. Thus, the district court reasoned that the Florida regulation directly conflicts with federal law and impedes the promotion of domestic commercial fishing, a primary purpose of the Magnuson Act stated in § 1801(b)(3), by restricting commercial mackerel fishing in federal waters.

4. To support this conclusion, the magistrate pointed to the language of § 1856(a)(3) quoted above, which prohibits a state from regulating any fishing vessels outside its boundaries "unless the vessel is registered under the law of that State." The defendants successfully argued that this phrase evidences Congress' intention to allow states to regulate fishing within the EEZ. In other words, if a vessel is registered in Florida, then it is subject to Florida regulations even when fishing in federal waters. Section 1856(a)(3) is the only reference this court has found in the Magnuson Act referring to permissible state regulation in any waters. For reasons later discussed, we do not believe Congress intended to leave the door open for state regulation in the EEZ; rather, we read this subsection to allow state regulation of vessels registered under state law and fishing in state territorial waters.

5. Defendants argue that the Council decided Florida's newly enacted landing rules aided in the implementation of the FMP by closing the fishery when the FMP limits are reached. As evidence of this decision, they say the Council withdrew the proposal to set federal landing limits because the state regulations solved the problem of overfishing off the east coast of Florida. We doubt the validity of this argument for several reasons. First, the Council would have authority to prepare and submit an amendment to the FMP to the Secretary of Commerce,

*see* 16 U.S.C. § 1852(h)(1) and § 1853(c), but the ultimate authority to review, revise, implement and publish a federal landing limit rests with the Secretary. *See id.* at §§ 1854(a)(1)(B) and (D), § 1854(b)(3)(D), and §§ 1855(c) and (g). Second, although the Council did not formally adopt Florida's landing limits as a proposed amendment to the FMP, nothing in the Magnuson Act would prohibit this. Consistency between the state and federal regulations does not necessarily follow solely from the Council's inaction, nor from its decision to abandon the discussion of a federal landing limit. Third, the record reveals some evidence that the idea of a federal landing limit was withdrawn because the mackerel subcommittee of the Council voted . to maintain the "status quo" and manage the commercial fishery "by a single quota in the federal waters." *See* R1–22, Exhibit 5 at pages 15–16. The district court did not make a specific finding as to why the Council dropped its consideration of a federal limit. It appears that the reason given by the defendants and relied upon by the magistrate (that Florida's regulations were consistent with federal policies) may not be the whole picture. Fourth, the idea of a federal landing limit is not a dead issue. The National Marine Fisheries Service recently published for comment a proposed regulation, which if implemented would establish possession and landing limits for Spanish Mackerel in the Atlantic Ocean. 57 Fed.Reg. 38810 (1992) (to be codified at 50 C.F.R. § 642.27(a)(2)).

The judge permanently enjoined the State of Florida from enforcing Chapter 46–23 in a manner that violates the Constitution, or that conflicts with the applicable federal regulations. Officials of the State of Florida and the Florida Conservation Association appeal this decision.

## DISCUSSION

■ Although we remand for additional factual findings, we think the Supremacy Clause will be dispositive of the case. There are several ways in which Congress can preempt state regulation in a given area. The question of preemption requires an examination of congressional intent, most easily ascertained when Congress explicitly defines the extent to which federal law preempts state law. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988). Absent explicit statutory language, however, courts may infer congressional intent to occupy a given field to the exclusion of state law "where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where 'the object sought to be obtained by the federal law and the character of obligations imposed by it ... reveal the same purpose.'" *Id.* at 299–300, 108 S.Ct. at 1150 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). If such intent cannot be implied because the congressional scheme has not entirely displaced state regulation in a particular field, state law is nevertheless preempted when it actually conflicts with federal law. *Id.* 485 U.S. at 300, 108 S.Ct. at 1150. A conflict will be found when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or "where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress", *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). *See also Schneidewind*, 485 U.S. at 300, 108 S.Ct. at 1150.

■ We think Congress outlined a fairly complete and pervasive federal scheme in the Magnuson Act, and believe Congress must have intended to occupy the field of fishery management within the EEZ. Neither the appellant's nor the appellee's brief fully elucidates the argument, but our reading of the statute reveals evidence of this intent. In § 1811(a) Congress claims for the United States "sovereign rights and *exclusive* management authority over all fish [except highly migratory species] ... within the exclusive economic zone." (Emphasis added.) In § 1801(c)(3) Congress declares its policy is to assure that the *national* program *involves* and is responsive to the affected states. (Emphasis added.) Sections 1801(b)(4) and (5) declare two purposes of the Act are to set national standards for fishery management and to establish regional fishery management councils. To this end the Act mandates the composition and authority of the councils, *see* §§ 1852 and 1853, such that the states "*participate in, and advise on,* the establishment and administration" of the fishery management plans, § 1801(b)(5) (emphasis added). The Act also empowers the Secretary of Commerce to guide the councils and to ensure compliance with the national standards and purposes of the Act. *See* §§ 1854 and 1855. Congress thus established a federal fishery zone; provided the states with an active role in managing the resources of the EEZ through their voting positions on a council; granted the ultimate responsibility for overseeing the program to the Secretary of Commerce; and left nothing pertaining to the EEZ for the states to regulate.

The legislative history of the Magnuson Act further supports the position that Congress intended to occupy the entire field of fishery management in the EEZ. The House Report unambiguously states "[t]he United States will exercise with respect to fisheries the same jurisdiction that it exercises in the territorial sea. The zone established by this Act differs from the zone established by the Act of 1966 only with respect to its dimensions." *See* H.R.Rep. No. 445, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 593, 618.

The Act of 1966, 16 U.S.C. § 1091 *et seq.* (repealed by the Magnuson Act), established a contiguous federal fishery zone beginning at the three-mile territorial sea and extending nine miles out. Section 1094 of the Act of 1966 read

> [n]othing in this Act shall be construed as extending the jurisdiction of the States to the natural resources beneath and in the waters within the [nine mile] fisheries zone established by this Act or as diminishing their jurisdiction to such resources beneath and in the waters of the territorial seas of the United States [the three mile zone].

Thus, the Act of 1966 maintained a state's authority within its territorial sea (held jointly with the federal government), and granted the federal government authority to manage the area nine miles beyond the territorial sea. The Magnuson Act simply preserved this separation of authority and extended federal management of fishery resources to the newly created 200 mile zone.

■ Given the limited factual record before us, we think the district court correctly held that Chapter 46–23 conflicts with the federal regulations. There is no daily landing limit set by the Magnuson Act or the FMP, only an annual quota for total catch of Spanish Mackerel. Under the FMP, the plaintiffs can legally harvest Spanish Mackerel in the EEZ and land the catch without further restriction until the federal quota has been reached. Hypothetically, if the plaintiffs were to harvest the entire federal annual quota from the EEZ (e.g. 2.99 million pounds in the Gulf of Mexico) on the opening day of season, Florida's regulation would prohibit them from landing more than the pounds permitted under that day's sliding scale (e.g. 1,500 pounds per vessel on April 1). It would be impossible for the plaintiffs to land their catch in compliance with both state and federal law in this scenario.

We do not decide on appeal whether Chapter 46–23 violates the Constitution, or whether it has been preempted by the Magnuson Act and relevant federal regulations, because we do not have factual findings sufficient to affirm or reverse. For example, some of the questions not answered by the district court's order are as follows: Was Captain Black's vessel registered in Florida and, therefore, subject to Chapter 46–23? How does Florida apply its regulation to vessels registered in Florida and those registered in other states? Does the Magnuson Act or Chapter 46–23 distinguish between vessels fishing in the EEZ and those in state territorial waters? How is the regulation enforced by the state? For instance, what happens when a vessel harvests Spanish Mackerel from both the EEZ and state waters in one trip? How does the federal government oversee the fishery management plans and monitor catches? How are the council meetings conducted and how does the federal government ensure the proper operation of a council? Specifically, were the Gulf Coast and Atlantic Council meetings at issue in this case conducted in accord with the Magnuson Act? What are the standards, if any, set by the Magnuson Act for allowing state regulation of activity in the EEZ? What attempt is made, if any, to coordinate the efforts of all affected states? What steps, if any, have other states taken?

Answers to these questions would enlighten our understanding of the analysis under the Equal Protection and Commerce Clauses, as well as the district court's reasoning under conflict preemption. The district court's conclusions may prove to be correct. We simply cannot find sufficient support in the record to satisfy our obligation upon review. We VACATE the judgment and REMAND this case for new proceedings consistent with this opinion.

COX, Circuit Judge, specially concurring:

I agree that this case should be remanded for further factual findings and therefore concur in the judgment. I consider it inappropriate to express tentative views on the serious issues presented and therefore do not join the opinion.