JORDAN, Circuit Judge,
dissenting.
The Majority interprets the pertinent regulations to unambiguously allow private gas companies to replace a pipeline anywhere, on anybody’s property, without any type of formal administrative review. In deciding that the Federal Energy Regulatory Commission (“FERC”) has extended such a broad grant of the sovereign power of eminent domain to private companies, the Majority relies on a definition of “replacement” not provided in the text of the regulations but supplied by Columbia, even though it is at odds with what Columbia admits is the common understanding of what constitutes a “replacement” and de *317 spite the fact that FERC had never adopted that definition until, in the middle of an unrelated rulemaking, the agency crafted a footnote in reaction to the District Court’s decision in this case. In my view, the Majority’s limitless reading of the regulations is deeply problematic and renders them constitutionally suspect. To avoid logical difficulties within the regulations, as well as to avoid constitutional concerns, some sort of locational limitation must serve as a constraint on pipeline replacement outside of an original right-of-way.
I agree with the District Court that the regulations are ambiguous and therefore resort to FERC interpretations is in order. But FERC has been inconsistent in its explanations of the regulations, and the agency’s most recent interpretation does not warrant deference. FERC’s previous interpretation, before it issued its footnoted reaction, reasonably indicated that there is indeed a locational limitation on pipeline replacements outside of an original right-of-way. Because the pipeline project at issue here does not adhere to any locational limitation at all, it is not a “replacement” within the meaning of that term in the regulations. As a consequence, Columbia should be required to petition FERC for a new certificate of public convenience and necessity before being permitted to condemn easements on property previously unaffected by Columbia’s pipeline. I therefore respectfully dissent.
I. Background
On January 7, 1983, Columbia obtained a blanket certificate of public convenience and necessity (the “Certificate”) that authorized the company to construct and operate a natural gas pipeline, known as “Line 1655,” at the location specified in the application. The Certificate continues to authorize the company to engage in limited, routine activities with regard to that main-line facility, as expressly identified in FERC regulations. But, “[f]or other categories of activities, which may potentially require more scrutiny and opportunity for public participation,” the Certificate calls for the company to submit to further regulatory procedures. (App. at 104 (footnote omitted).) Columbia now seeks to use its decades-old Certificate to construct a “replacement” pipeline “up to a mile away” from the original Line 1655 and on the lawns of the homes of Dwayne and Ann Brown, Bradley and Elizabeth Herr, Myron and Mary Jo Herr, and Douglas and Tessa Hilyard (collectively, the “Landowners”). (Appellee’s Br. at 7.)
Columbia attempted at first to negotiate easements across the Landowners’ properties but was refused. It warned the Landowners that the offers it had made “do[ ] not represent Columbia’s view of the impact of the project on the fair market value [of the properties]. To the contrary, Columbia believes that the impact on fair market value will be much less.... ” (App. at 277, 301, 342, 379.) If the Landowners declined Columbia’s initial offers, it threatened, “Columbia w[ould] pursue the alternate acquisition process provided to natural gas companies by the Natural Gas Act.” (App. at 278, 302, 343, 380.) In other words, interpreting its thirty-year-old Certificate to be a blank check for land condemnation, Columbia negotiated with an implicit threat: take our offers now or forfeit your property rights later, for considerably less money, in a condemnation proceeding.[1] After the Landowners main *318 tained their rejection of Columbia’s offers, the company sought to make good on that threat by filing the eminent domain suit now on appeal.
The District Court granted the Landowners’ motions for summary judgment on the question of Columbia’s asserted right to the easements. In denying Columbia’s motion for partial summary judgment on the same issue, the District Court held that “the project is not automatically authorized as a ‘replace[ment]’ of an ‘eligible facility’ pursuant to 18 C.F.R. §§ 157.202(b)(2)(i) & 157.208(a).” (App. at 35.) Columbia petitioned to alter or amend the judgment, which was denied. The Court observed that “[Columbia]’s attack does not point to an actual error in reasoning behind the Court’s judgment. Instead, Columbia ... asserts that the Court should wholly defer to an agency interpretation that — according to precedent that Columbia ... ignores — is properly due very little deference, if any beyond its power to persuade.” (App. at 56.) The Court’s reference to “an agency interpretation” is to FERC’s “about-face” (App. at 54), discussed below, on whether a locational limitation restricts where a “replacement” pipeline can be put.
II. Discussion
Until recently, Columbia would not have been able to construct pipeline on a new route, as they are attempting to do in the proposed Line 1655 project, without seeking a new certificate of public convenience and necessity associated with the new right-of-way. At least not according to FERC. In 2003, that agency issued a notice entitled Emergency Reconstruction of Interstate Natural Gas Facilities Under the Natural Gas Act, 68 Fed.Reg. 4120, 4122 (proposed Jan. 17, 2003) (to be codified at 18 C.F.R. pt. 157) (hereinafter Emergency Reconstruction Notice or Notice),[2] in which it discussed at length its then-current interpretation of the regulations now in question, particularly Title 18, Part 157 of the Code of Federal Regulations, which governs “eligible facilities,” 18 C.F.R. § 157.202, .208. An eligible facility is a natural-gas installation, such as a pipeline, eligible for alteration, such as replacement, under the original certificate granted for the development of that facility. 18 C.F.R. § 157.202(b)(2).[3] FERC apparently saw a shortcoming in the regulations, namely that they do not allow companies to effectively respond to an emergency that might require a pipeline to be moved or new pipeline to be installed on a route that varies significantly from the right-of-way contemplated in an already-issued certificate. Id. at 4120-24. For example, in the Emergency Reconstruction Notice, FERC indicates that § 2.55 of the regulations,[4] which governs replacement projects *319 •within an authorized right-of-way, is insufficient to address an emergency situation because it does not allow for construction “outside the footprint of existing facilities.” Id. at 4123.
The Notice also says that “[P]art 157 ... provides [a] vehicle for reconstruction of facilities ... but this authority is ... limited.” Id. at 4121. It goes on to explain that, “[a]cting under blanket authority, [i.e., the authority under Part 157 conferred by a certificate,] a pipeline may install new facilities on a new right-of-way, which may be acquired through the pipeline’s exercise of eminent domain.” Id. That authority “permit[s] locating a portion of mainline ... replacement facilities outside, but presumably adjacent to, an existing right-of-way....” Id. at 4122 (emphasis added). FERC further recognized this locational limitation on Part 157 authority by saying that “[t]hese regulations ... do not appear to contemplate mainline construction over an entirely different route as may be necessary to circumvent the site of a disaster if immediate replacement is necessary before the original site is again available.” Id. (emphasis added).
I understand that language to mean, as the District Court did, that Part 157 authorizes “replacements” that may involve placing a pipeline some minimal distance from its original right-of-way but that such a project must indeed involve only a very limited deviation from that route. The Majority, at Columbia’s urging, sees the matter quite differently. As Columbia put it in argument before the District Court, when it comes to replacements, “[u]nder 157 there is no location restriction. There is no proximity restriction.” (App. at 776.)
What there is, in short, is an ambiguity in the use of the word “replacement” in the regulations. See In re Phila. Newspapers, LLC, 599 F.3d 298, 304 (3d Cir.2010) (stating that a regulatory provision is ambiguous “where the disputed language is reasonably susceptible of different interpretations” (citation and internal quotation marks omitted)). Despite the Majority’s assertion to the contrary, the meaning of that term is not clear, and we are left to dispute whether a pipeline “replacement” outside of an original right-of-way includes a locational limitation or is instead a concept without physical limits. That ambiguity is the first of two related problems in this case. The second is that the alternative interpretations of the ambiguous regulation are not equally innocuous. The one advocated by Columbia and adopted by the Majority raises internal inconsistencies and constitutional issues that can and ought to be avoided. I discuss both of those problems in turn.

A. Ambiguity & Deference

1. Ambiguity

The Majority concludes that the regulations are unambiguous primarily by relying on the interplay between the right-of-way locational limitation in § 2.55(b) and the lack of an express locational limitation in the definition of “eligible facility” in § 157.202(b)(2)(i). For two reasons, I disagree with the conclusion my colleagues draw from that difference. First, sound principles of interpretation “dictate that a regulatory scheme should be read as a whole, so that effect is given to all its provisions.” Cumberland Coal Res., LP v. Fed. Mine Safety & Health Review Comm’n, 515 F.3d 247, 254 (3d Cir.2008) (internal quotation marks omitted). As described in more detail herein, the Majority’s approach fails to do that: it conflates “replacement” and “relocation,” even *320 though each has a specific and unique meaning in the regulations. Also, by interpreting the term “replacement” so broadly, it undermines § 2.55(b) because it leaves practically no limitation for replacement projects outside of an existing right-of-way. Further, it allows gas companies to circumvent the important notice and hearing requirements of §§ 157.6 and 157.10, which necessitate providing notice to both directly and indirectly affected property owners and an opportunity to participate in a regulatory hearing regarding certificate petitions.[5]
Second, the phrase “replacements that do not qualify under § 2.55(b) ... because they ... will not satisfy the location or work space requirements of § 2.55(b),” 18 C.F.R. § 157.202(b)(2)(i), is ambiguous because Part 157’s use of “replacement” is reasonably susceptible to at least two different interpretations. The District Court, relying on the dictionary, defined “replace” as “to place again: restore to a former place, position, or condition,” which, as the Court noted, suggests either no relocation or an insignificant relocation. (App. at 32.) The Majority, however, disagrees with that definition and says that, “[p]ut simply, in common parlance, ‘replace’ can mean to substitute for.” (Maj. Op. at 309.) That is one reading of “replace.” But, although my colleagues think their selected definition is the only applicable one, another and better reading in this context, which involves locational issues, is the one chosen by the District Court.[6]
The Majority’s preferred reading of “replace” leads it to declare that applying a location-focused definition of the term is “absurd.” (Id. at 310-11.) It asserts that the position taken by the District Court and that I am advocating requires the replacement pipeline to be in exactly the same spot as the original. That is not so, and ordinary speech is not so rigid, as one of the Majority’s own examples indicates: “after dusting the vase, she replaced it on the shelf.” (Id. at 311 (internal quotation marks omitted).) When the vase makes it back onto the shelf, it has been replaced there, whether it is an inch or two to the left or right of where it had been. The location for the replacement is not a matter of pinpoint accuracy, but there is a limit. No one would describe the action as “replacing” the vase if it were put in another room. The Majority’s certitude cannot mask the fundamental problem with its view. If the only requirement for a replacement is that it “substituyes] new for old” (Maj. Op. at 309, 314), then a gas company may now replace pipeline originally located in York, Pennsylvania, anywhere in the United States, from Portland to Poughkeepsie, as long as that original pipeline is somehow “old” and the replacement pipeline is somehow “new.” Whatev *321 er the interpretation of “replace,” that hardly seems the correct one, let alone the only plausible one. As the District Court said, that reading “puts an excessively expansive gloss on the common meaning of’ the word. (App. at 32.) At the very least, “replacement” is ambiguous in this context, and so is the regulatory provision of which that term is a part.
Columbia tries to avoid that conclusion by asserting that the term “replacement” “has a specific meaning under the Code of Federal Regulations” (Appellant’s Opening Br. at 24) that is “entirely different ... than in everyday parlance” (Appellant’s Reply Br. at 7). In other words, Columbia acknowledges that its proposed definition of replacement is not the only or even the most common interpretation. One might expect that, since Columbia and the Majority are rejecting “everyday parlance,” their very different understanding of the word “replacement” would be rooted in some clear language in the Code of Federal Regulations delineating a specialized meaning. Cf. Rowland v. Cal. Men’s Colony, 506 U.S. 194, 200, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) (“[Cjourts would hardly need direction where Congress had thought to include an express, specialized definition for the purpose of a particular Act....”). But it is not. The specialized, non-customary definition they rely on is nowhere to be found in the regulations themselves; nor is it in any agency interpretation pre-dating the District Court’s decision. Instead, in deciding that the word is unambiguous, the Majority relies on Columbia’s favored definition, which the Majority says is dictated by “clear understanding.” (Maj. Op. at 311.) Despite Columbia’s admission about “everyday parlance” (Appellant’s Reply Br. at 7), and despite the Majority’s own admission that “ ‘replace’ can mean to substitute for, or it can mean ... to put back in the same position” (Maj. Op. at 309 (emphasis added)), the Majority proclaims that the “only appropriate” definition is the one “eon-tainting] no inherent adjacency requirement.” (Id. at 309.) If assertion were argument, that might be more persuasive, but declaring that something is unambiguous does not make it so.
Fortunately, we do not, in this administrative-law setting, need to choose between different dictionary definitions. The fact that there are at least two ways of understanding the word “replacement” shows that it is ambiguous, which requires us to consider how FERC has interpreted the word. See Christensen v. Harris Cnty., 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (“Auer deference is warranted only when the language of the regulation is ambiguous.”). That effort raises its own choices.

2. Deference

As noted earlier, FERC looked at the issue of replacement when it considered the Emergency Reconstruction Notice. Although the Notice is just that — a notice of proposed rulemaking — it answered the question of whether an additional limiting principle is necessary for replacements outside of a right-of-way authorized in a FERC-granted certificate. FERC published the Notice for the very reason that there was no authority under Part 157 to replace a pipeline in a location other than an existing right-of-way or “outside, but presumably adjacent to, an existing right-of-way,” even in an emergency. Emergency Reconstruction Notice, 68 Fed.Reg. at 4122. FERC itself acknowledged the locational limitation on pipeline replacement, saying the regulation “do[es] not appear to contemplate mainline construction over an entirely different route as may be necessary to circumvent the site of a disaster.” Id.
*322 For a decade that was the last word on the matter, but one should never underestimate the continuing malleability of words. Despite FERC’s well-grounded and plainly stated insight about the locational limitations in Part 157, the agency made a 180-degree turn one week after the District Court issued its opinion in this case and decided that mainline construction really is a free-form exercise after all. In a rule published on November 22, 2013, Revisions to Auxiliary Installations, Replacement Facilities, and Siting and Maintenance Regulations, 78 Fed.Reg. 72794, 72804 n. 78 (Dec. 4, 2013) (to be codified at 18 C.F.R. pts. 2, 157, 380) (hereinafter Revisions to Auxiliary Installations), FERC inserted a footnote designed to “[e]ffectively[ ] ... repudiate! ] the District Court’s interpretation of the regulation at issue” (Maj. Op. at 308). In that footnote, number 78 to be precise, FERC gave what amounts to an on-the-fly approval of the Line 1655 project by stating that “the Part 157 blanket certificate regulations impose no limitations on the placement of the facilities.” Revisions to Auxiliary Installations, 78 Fed.Reg. at 72804 f.78. This new “Footnote Rule,” as I will refer to it for convenience, is directly contrary to the interpretation provided in the Emergency Reconstruction Notice. Id. The question then arises: which FERC interpretation should be heeded?
A choice has to be made because an agency’s interpretations of its own ambiguous regulations are, under Supreme Court precedent, entitled a degree of deference. The direction given in Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), is that the agency’s interpretation is controlling unless it is “plainly erroneous or inconsistent with the regulation.”[7] Id. at 461, 117 S.Ct. 905 (internal quotation marks omitted). Nevertheless, in Christopher v. SmithKline Beecham Corp., the Court recently cautioned that “this general rule [of deference] does not apply in all cases.” — U.S. —, 132 S.Ct. 2156, 2166, 183 L.Ed.2d 153 (2012); see also Harry T. Edwards et al., Federal Standards of Review, ch. XIV (“[T]he deference afforded an agency’s interpretation of its own regulations is significant, but it is not without limits.”). Christopher teaches that, once a regulation has been determined to be ambiguous, two questions should be considered in deciding whether an agency’s new interpretation of the ambiguous provision is entitled to Auer deference: (1) whether the new interpretation is “plainly erroneous or inconsistent with the regulation,” and (2) whether the interpretation “reflectas] the agency’s fair and considered judgment on the matter in question.” Christopher, 132 S.Ct. at 2166 (internal quotation marks omitted). An interpretation does not reflect fair and considered judgment if, for example, it “conflicts with a prior interpretation,” or is “nothing more than a convenient litigating position,” or is “a post hoc rationalizatio[n] advanced by an agency seeking to defend *323 past agency action against attack,” or if deference “would seriously undermine the principle that agencies should provide regulated parties fair warning of the conduct [a regulation] prohibits or requires.” Id. at 2166-67 (alterations in original) (citations and internal quotation marks omitted).
Christopher also expressed a concern that agencies may take improper advantage of the deference extended to them under Auer: “Our practice of deferring to an agency’s interpretation of its own ambiguous regulations undoubtedly has important advantages, but this practice also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby ‘frustrating] the notice and predictability purposes of rulemaking.’” Id. at 2168 (alteration in original) (footnote omitted) (quoting Talk Am., Inc. v. Mich. Bell Tel. Co., — U.S. —, 131 S.Ct. 2254, 2266, 180 L.Ed.2d 96 (2011) (Scalia, J., concurring)).
If a court finds that either the “plainly erroneous” or “fair and considered judgment” factor cuts against the agency’s interpretation, that interpretation is reviewed not under Auer, but rather under the Supreme Court’s decision in Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). See, e.g., Christopher, 132 S.Ct. at 2168-69 (turning to the Skidmore standard after concluding that “whatever the general merits of Auer deference, it is unwarranted here”). Under Skidmore, deference is “proper only if the [agency’s view] has the power to persuade, which ‘depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.’ ” Vance v. Ball State Univ., — U.S. —, 133 S.Ct. 2434, 2443 n. 4, 186 L.Ed.2d 565 (2013) (second and third alterations in original). In short, Skidmore deference is “a lesser degree of deference” than is given under Auer because it considers the interpretation as having at most the power to persuade, not the power to control. Hagans v. Commn’r of Soc. Sec., 694 F.3d 287, 294-95 (2012).[8]
With that guidance in mind, I turn to the Emergency Reconstruction Notice and the Footnote Rule. The interpretation in the Notice acknowledges a much-needed constraint on how far a replacement project can stray from an original right-of-way. The Notice instructs that Part 157 does not authorize a pipeline replacement that proceeds on an entirely new route or is beyond what may fairly be characterized as being on or “adjacent” to the original right-of-way. If the proposed replacement pipeline does not fall within those limitations, the gas company must approach FERC for a new certificate. Nothing about the Notice indicates that the interpretation it provides is plainly erroneous or fails to reflect FERC’s fair and considered judgment. It would seem, then, to be guidance of the kind suited for Auer deference.
My colleagues, however, endeavor to downplay the importance of the Notice. They read its statement that Part 157 “permitfs] locating a portion of mainline[ ] ... replacement facilities outside, but presumably adjacent to, an existing right-of-way,” Emergency Reconstruction Notice, *324 68 Fed.Reg. at 4122, as meaning that, while practical considerations will generally prompt gas companies to build on the same or an adjacent route, those utilities need not do so. The word that the Majority uses to turn language of limitation upside down is “presumably.” But such heavy reliance on that word to undo the express limitation in the Notice is misplaced. In the very next sentence of the Notice, FERC made clear that the regulations “do not appear to contemplate mainline construction over an entirely different route.” Id. The Notice thus states and restates the necessary principle that should be guiding our instruction to Columbia today: if you want to take someone else’s property for your pipeline, stay near your right-of-way and do not construct along a new route; otherwise, come back for a new certifícate.
The Majority deems the advice in the Emergency Reconstruction Notice to be irrelevant because it “dealt specifically with emergencies such as a ‘sudden unanticipated loss of natural gas or capacity,’ not deteriorating pipelines.” (Maj. Op. at 312 n. 16.) Although it is true that the Notice advocated adoption of certain new regulations focused on how to better deal ■with emergency situations, that does not mean that the interpretation it provides of the existing regulations in Part 157 is of no consequence. The interpretation provided in the Notice is very relevant indeed, being, as it is, a FERC statement about the meaning of Part 157 that can rightly be called “just and considered.” It gives guidance on what Part 157 authorizes and what its restrictions are, without limiting those restrictions to emergency situations. See Emergency Reconstruction Notice, 68 Fed.Reg. at 4122 (“[P]art 157, subpart F, permits replacement construction that uses temporary workspace beyond the bounds of the temporary workspace previously used to construct the original facilities as necessary to install replacement facilities. These regulations also permit locating a portion of mainline, lateral, or compressor replacement facilities outside, but presumably adjacent to, an existing right-of-way where, for whatever reason, the new facilities could not be placed entirely within the original facilities’ existing right-of-way.” (emphasis added)). The interpretation advanced in the Notice is therefore generally applicable here.
The Footnote Rule, by contrast, is a textbook example of an agency shooting from the hip rather than giving a question fair and considered judgment. Despite the Majority’s comments to the contrary, FERC’s creation of footnote 78 one week after the District Court’s opinion shows it to be a hastily arrived-at decision, devoid of the hallmarks of an agency interpretation deserving deference. The timing reveals the Footnote Rule as a post hoc rationalization meant to defend a past action, in this case Columbia’s attempt to obtain property outside of the right-of-way allowed in its Certificate. Cf. Christopher, 132 S.Ct. at 2166 (noting that regulatory changes reflecting post hoc rationalization do not receive Auer deference). Moreover, the insertion of the new interpretation in a footnote in the middle of an unrelated rule[9] about auxiliary facilities emphasizes FERC’s eagerness to get it *325 out as rapidly as possible, with the aim of undoing the District Court’s decision. Again, that serves to highlight the interpretation as a post hoc rationalization of Columbia’s asserted condemnation power. Cf. Martin v. Occupational Safety & Health Review Comm’n, 499 U.S. 144, 156, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (declining to defer to “ ‘post hoc rationalizations’ ... advanced for the first time in the reviewing court”).[10]
The Majority endeavors to pass off the new interpretation in the Footnote Rule as “perfectly harmoni[ous]” with what was previously said in the Emergency Reconstruction Notice (Maj. Op. at 313), but that ignores the warning in the Notice that Part 157 does “not appear to contemplate mainline construction over an entirely different route as may be necessary to circumvent the site of a disaster if immediate replacement is necessary before the original site is again available,” Emergency Reconstruction Notice, 68 Fed.Reg. at 4122. Because FERC opined that Part 157 does not allow new routing for a “replacement” pipeline even in the event of an emergency, there is precious little logic and no consistency in saying that new routing is permitted in the absence of an emergency. It is thus not harmonious to assert, as the Footnote Rule does, that “Part 157 ... regulations impose no limitations on the placement of [replacement] facilities.” Revisions to Auxiliary Installations, 78 Fed. Reg. at 72804 n. 78. FERC at first interpreted Part 157 to include a geographic limitation on replacement projects. The Footnote Rule, issued with no notice and within a week of the judicial action to which it was a reaction, purports to completely do away with that limitation. The two interpretations are plainly in opposition.
FERC itself tacitly admits as much in footnote 78. It says, “[w]hile the Commission has indicated previously that it is contemplated that replacement facilities constructed under blanket authority!, i-&, pursuant to a FERC-granted certificate,] would usually be located adjacent to, if not within, an existing right-of-way, [Part 157] permit[s] the construction of non-main line facilities and main line facilities! ] ... without restriction on their location.” Id. No *326 one, not even those in the Majority, can claim that what FERC was doing in that passage was saying how consistent its newly announced position is with its past statements. The evident purpose in giving a nod to what was said previously was to acknowledge but minimize the change in position. The while-we-previously-said locution hangs a bell on the difference.
That does not alter my colleagues’ approach, though. They look to the use of the word “usually” — a replacement will usually be adjacent to or within an existing right-of-way — and they conclude that it must mean FERC never really laid down an interpretation that restricts the location of a replacement pipeline. (See Maj. Op. at 313.) Like the word “presumably” in the Notice, however, the word “usually” in the Footnote Rule cannot carry the analytical weight the Majority puts on it. Rather than showing there is no rule, “usually” and “presumably” are words indicating that there is in actuality a standard way of proceeding — a rule, so to speak — one to which occasional exceptions may be found but a rule nonetheless. A statement that repudiates what had been the rule cannot rightly be labeled as being in harmony with the rule.
There is yet another reason to reject footnote 78 as the product of fair and considered judgment. In Christopher, the Supreme Court noted that, “where[ ].... an agency’s announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute.” 132 S.Ct. at 2168. Here, FERC issued the Footnote Rule in November 2013, over a decade after it published the Emergency Construction Notice. Anyone paying attention would certainly be surprised to find that what had been, by the agency’s own interpretation, a presumptive limitation on where a pipeline could be replaced was suddenly no limitation at all. Deference to the Footnote Rule under such circumstances serves to foster cynicism and to subvert the purpose of formal rulemaking.[11]
FERC’s new interpretation of Part 157 thus ought not receive the benefit of Auer deference, and it is no more salvageable under Skidmore. Footnote 78 is unpersuasive for all of the points already discussed. Cf. Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S. —, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013) (noting an agency’s “explanations lack the persuasive force that is a necessary precondition to deference under Skidmore ”). It fails to persuade on another ground as well: it is inconsistent with Part 157 itself. If I understand the Majority correctly, Columbia’s project can be considered as both a relocation and a replacement. That at least appears to be what Columbia believes, as shown in comments before the District Court. At a single hearing, it referred to the proposed Line 1655 construction interchangeably as a “replacement” and a “relocation.” (Compare App. at 770 (“The pipeline itself is an eight inch gas main. The gas main is going to be relocated.”), and App. at 787 (“We are not rerouting. We are relocating....”), with App. at 775 (“We have the right to construct a replacement main that would not qualify under a 2.55 analysis.”).)
The words “replacement” and “relocation” are not intrinsically incompatible as synonyms. Part 157, though, treats them differently, as denoting separate methods of authorizing pipeline construction, with different requirements applicable to each. *327 When we examine a statute, “[w]e generally seek to respect Congress’ decision to use different terms to describe different categories of people or things.” Mohamad v. Palestinian Auth., — U.S. —, 132 S.Ct. 1702, 1708, 182 L.Ed.2d 720 (2012). Our approach in reviewing a regulation should be the same. Part 157 defines authorized “replacement” projects as follows: “[Eligible facility includes main line, lateral, and compressor replacements that do not qualify under § 2.55(b) [governing work within a certifícate^designated right-of-way] ... because they will ... not satisfy the location or work space requirements of § 2.55(b).” 18 C.F.R. § 157.202(b)(2)® (emphasis added). As for a “relocation” project, the regulation couches it not as a replacement but as a “miscellaneous rearrangement,” saying, “Miscellaneous rearrangement of any facility means any rearrangement of a facility ... including changes in existing field operations or relocation of existing facilities.... ” Id. § 157.202(b)(6) (emphasis added). Because “replacement” and “relocation” are intended to mean different things in Part 157, an interpretation that allows the concept of the former to absorb the latter is dubious, but that is what the Majority’s interpretation does. As noted by the District Court and as mentioned above, the definition of “replace” advocated by Columbia — and now adopted by the Majority — “puts an excessively expansive gloss on the common meaning” of that word (App. at 32), and thereby improperly allows Columbia to “replace” pipeline by constructing new pipeline a mile (or, for that matter, any distance) from the original right-of-way. When a replacement pipeline can go anywhere, there is no need to consider it for “relocation,” and the separate provision for relocation is thus made of no effect.
In sum, the Footnote Rule is entitled to neither Auer nor Skidmore deference, and the interpretation in the Emergency Reconstruction Notice remains the best guidance. The District Court did not err in deciding that, because the Line 1655 project is neither within nor adjacent to the existing right-of-way,[12] the project is not a “replacement” under Part 157, Emergency Reconstruction Notice, 68 Fed.Reg. at 4122, and thus cannot proceed without an additional certificate of public convenience and necessity.
B. Constitutional Concerns[13]
An additional reason to adopt the Emergency Reconstruction Notice’s interpretation of Part 157 is that the Majority’s interpretation would render the regulations constitutionally infirm. The Majori *328 ty’s broader interpretation of “replacement” inappropriately grants to a private company eminent domain power coextensive with that of the state and strips future aggrieved landowners of their rights to formal administrative procedures. An essential canon of construction is that, if a court is faced with two possible interpretations of a regulation, “by one of which [the regulation] would be unconstitutional and by the other valid, [the court’s] plain duty is to adopt that which will save the [regulation].” Nat’l Collegiate Athletic Ass’n v. Governor of N.J., 730 F.3d 208, 226 n. 8 (3d Cir.2013) (quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937)) (internal quotation marks omitted). The more limited interpretation of “replacement” provided by the Emergency Reconstruction Notice should accordingly be applied to preserve §§ 157.202 and 157.208 as they relate to main-line replacements of eligible facilities.
The Supreme Court has recognized that there are tighter bounds on the exercise of eminent domain by a utility company than there are on that power when wielded by the sovereign. In United States v. Carmack, the Court held that “[a] distinction exists ... in the case of statutes which grant to others, such as public utilities, a right to exercise the power of eminent domain on behalf of themselves. These are, in their very nature, grants of limited powers.” 329 U.S. 230, 243 n. 13, 67 S.Ct. 252, 91 L.Ed. 209 (1946) (emphasis added); see also Nat’l R.R. Passenger Corp. v. Two Parcels of Land, 822 F.2d 1261, 1264-65 (2d Cir.1987) (“Amtrak has not been authorized to exercise the sovereign’s power of eminent domain. It has been granted a limited power, within the meaning of United States v. Carmack, to condemn land ‘required [for] intercity rail passenger service.’ ” (alteration in original) (citations omitted)). That conclusion makes sense: when the power of eminent domain is partially delegated to a private company, that delegation must be as limited as possible to protect landowners from abusive takings under the Fifth Amendment.
The Majority seems to suggest that a private company’s self-interest is a satisfactory limitation on the scope of the delegated power to take other people’s property. (See Maj. Op. at 311 (“A replacement pipeline would ‘presumably’ be adjacent to an existing pipeline for ... practical reasons — cost ... and convenience.”); id. at 313 n. 18 (“Columbia would appear to be constrained in replacing outside the existing right of way by the extra costs of doing so, including costs of negotiation and or litigation with landowners.”).) I am a great believer in the power of self-interest, but it does not serve as a constitutional check. We do not allow the government to condemn people’s land without layers of procedural protection in place, and we certainly cannot allow a private company to do so simply on the assurance that it has reasons to exercise restraint. Yet an unsupervised condemnation power is exactly what Columbia claims to have under Part 157. When asked by the District Court if the interpretation Columbia was proposing meant that, in pursuing the Line 1655 “replacement” project, the company “could construct this line in, say, Lincoln, Nebraska,” Columbia’s counsel responded, “On a theoretical level you could.” (App. at 776.) Counsel then outlined “practically” why that would not happen (id.), but that, as I will explain, amounts to cold comfort. “Trust me” is not a reassuring response to the question, “What will you do with the sovereign’s power?”
Although Columbia contends that there are no locational limitations on replacing a main line under Part 157, it points to four things that it says, and the Majority agrees, should mollify concerns about giv *329 ing to a utility the full condemnation power of the sovereign without the structural and procedural checks that limit the government. Those four things are monetary restrictions, a notice requirement, an environmental-impact-statement requirement, and a reporting requirement. In this case, none of them function as a meaningful restraint.
It is true that a “replacement” pipeline can be built with less FERC supervision if its cost is below a monetary threshold. In 2013, the year Columbia began work on Line 1655, that threshold was $11,000,000, and staying below it meant that a gas company could avoid providing any formal notice or environmental-impact statement to FERC before identifying the land on which it planned to build. 18 CFR § 157.208(a)-(b), (d). Columbia at first projected that its costs would be below $11,000,000, so the notice and environmental-impact-statement requirements were made inapplicable here. The reporting requirement, meanwhile, is merely an annual “check-in” with FERC in which a gas company provides some information for each facility scheduled for completion that year. 18 C.F.R. § 157.208(e).[14] Therefore, other than the locational limitation now at issue, the cost cap was to be the lone constraint on Columbia’s construction plans.
But, in this case, FERC actually waived even the $11,000,000 cost cap, thus removing the last restraint on the company’s exercise of eminent domain.[15] With that restriction removed, § 157.208 swallows § 2.55(b), for if a natural gas company seeks to move its pipeline outside the original right-of-way and thus outside of § 2.55(b)’s purview, there is really nothing to prevent it from doing so.
The Majority proffers other “curbs” on replacement projects, in addition to its misplaced faith in its own perception of a gas company’s self-interest. (Maj. Op. at 305-06.) Those include a requirement that the “ ‘primary purpose’ ” of replacements be for sound engineering purposes — in other words, that “ ‘there must be a physical need to replace facilities’ ” and that gas companies may not circumvent pipeline requirements merely by designating a project as a “ ‘replacement.’ ” (Maj. Op. at 305-06 (quoting 18 C.F.R. § 157.202(b)(2)(i); Revision of Existing Regulations Under the Natural Gas Act, 64 Fed.Reg. 54522, 54527 (Sept. 29, 1999) (codified at 18 C.F.R. part 157)).) My colleagues also say that gas companies may not construct new delivery points or replace pipeline for the primary purpose of increasing main line capacity. And they point out that, if a landowner has a problem with a gas company’s use of eminent domain, that person may file a complaint with FERC. But just as Columbia’s claimed limitations are insufficient, so are those proposed by the Majority.
*330 As for the primary-purpose requirement, because FERC does not review projects that are automatically authorized, 18 C.F.R. § 157.208(a), as Columbia says is so in this instance, there is no independent way to determine what the primary purpose of the replacement is. As for delivery points, they have nothing to do with the present dispute — they are not pipelines. As for capacity, I assume my colleagues are referring to the provision of that regulation which excludes from the definition of “eligible facility” “[rjeplacements for the primary purpose of creating additional main line capacity.” 18 C.F.R. § 157.202(b)(2)(i). That regulation prohibits gas companies from undertaking a replacement for the primary purpose of increasing the gas capacity of the pipeline. Again, though, the regulation as interpreted by the Majority would permit a gas company to construct pipelines anywhere outside the original right-of-way and thus does not preserve constitutional protections for property owners. And, finally, as for the option landowners have of filing complaints with FERC, it is perverse to foist upon the citizenry the obligation of policing those whom the government, as agents of the citizenry, are already supposed to be policing.
To repeat, because the cost cap — the only legitimate control on Columbia’s “automatic authorization” of its exercise of eminent domain — is waivable by FERC and thus proves to be an unreliable restraint, the Majority’s interpretation of Part 157 is constitutionally suspect in that it permits a delegation of power beyond that which can properly be made to a private company. The District Court exaggerated only a little in saying that the interpretation proposed by Columbia and since adopted by the Majority means that a “certificate automatically authorizes relocation of replacement Line 1655 literally anywhere on earth, so long as the replacement ‘will not satisfy the location or work space requirements of § 2.55(b).’ ” (App. at 32.) That outcome is untenable.
The Majority’s ruling presents another constitutional problem. In Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), the Supreme Court distinguished the concerns arising from agency actions that affect broad swaths of the population and those zeroing in on a handful of individuals, noting that the latter were more significant. It made clear that, when agency action affects “[a] relatively small number of persons,” those individuals are “exceptionally affected.” Id. at 446, 36 S.Ct. 141. Such action is adjudicative in nature, and property owners are entitled to procedural due process above and beyond that which has been provided by the legislature via the agency’s organic statute. Id.
Consistent with that safeguard, Congress and FERC require significant oversight of any construction outside a FERCissued certificate’s right-of-way. Specifically, the Natural Gas Act provides, “[n]o natural-gas company ... shall ... undertake the construction or extension of any facilities therefor ... unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations.” 15 U.S.C. § 717f(c)(l)(A). Thus, the requirements for obtaining a new certificate apply “in every case where a natural gas company acquires additional property, even for operation and maintenance purposes.”[16] *331 Williston Basin Interstate Pipeline Co. v. Exclusive Gas Storage Leasehold, 524 F.3d 1090, 1097 (9th Cir.2008). A “key Congressional goal in enacting the NGA [was] to have FERC balance the competing public interests involved in a proposed project through the issuance of certificates of public convenience and necessity.” Id.; see 15 U.S.C. § 717f(e) (setting forth factors for FERC to consider in deciding whether to issue a FERC certificate). Notably, FERC has interpreted that provision to require detailed notice to affected landowners of their rights as to the proposed project and a formal hearing where they have an opportunity to intervene and protest it. 18 C.F.R. §§ 157.6(d)(2), 157.10.
The Majority manages to turn those limiting regulations into a grant of limitless authority to natural gas companies for basically the same activity as long as that activity is labeled a “replacement.” The approach adopted today allows a gas company to bypass all notice-and-hearing requirements by tying its proposed project to the originally authorized pipeline, even if that authorization was provided decades ago and in an entirely different location. No consideration is given to the rights of newly affected parties. That is fundamentally at odds with regulations requiring notice and an opportunity to participate in certificate hearings.
It is also at odds with what the Supreme Court has said about the searching review FERC is supposed to undertake before issuing a certificate:
[A] natural gas company must obtain from FERC a ‘certificate of public convenience and necessity’ before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce. FERC will grant the certificate only if it finds the company able and willing to undertake the project in compliance with the rules and regulations of the federal regulatory scheme.
Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 302, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988) (citation omitted). In short, the Supreme Court has read § 717f(h) of the Natural Gas Act to require gas companies to apply for a new certificate prior to engaging in construction projects like the one here, as the companies are subject to FERC’s “statutory duty” to carefully review any new project that “constructs, extends, acquires, or operates any facility for the transportation” of natural gas.[17] Id.
*332 FERC, once upon a time, interpreted its regulations to require notice and hearings to protect affected landowners’ interests and balance them with the public interest in a safe and properly functioning supply of natural gas.[18] The Majority’s reading of the regulations, while very convenient for Columbia and perhaps the public at large, leaves those procedural, even constitutional, protections for property owners in tatters.[19]
III. Conclusion
Because the Emergency Reconstruction Notice provides an interpretation that is not plainly erroneous and that reflects a fair and considered judgment concerning limits on where a replacement pipeline may be located, we should give that interpretation deference. The District Court did not err in understanding that such a limitation is necessary, nor in determining that a significant departure from the pipeline’s original route exceeds that limit. Thus, applying basic administrative-law principles leads to the conclusion that we should be affirming the ruling of the District Court. Speaking more generally, it is disturbing and discouraging that, by today’s ruling, the Majority endorses a view of delegated sovereign power so broad that a private gas company, with no agency oversight or other significant procedural restraint, can take the property of other citizens far removed from that company’s original right-of-way. I therefore respectfully dissent.

. The Majority labels this a "sensationalist reading of Columbia’s statement” that "has no basis in the record.” (Maj. Op. at 304 n. si I will leave it to the readers of our competing opinions in this case to determine who may be indulging in the more extravagant *318 language. Suffice it to say here that, in the language quoted above, there is a basis for the observation that Columbia negotiated with the threat of condemning the easements for less than the earlier offers.

. Ultimately, FERC promulgated a Final Rule based on the Emergency Reconstruction Notice. Emergency Reconstruction of Interstate Natural Gas Facilities Under the Natural Gas Act, 68 Fed.Reg. 31,596 (May 18, 2003) (to be codified at 17 C.F.R. pt. 157) (hereinafter Emergency Reconstruction Final Rule).

. Section 157.202(b)(2)(i) provides, in relevant part, that "eligible facility includes main line, lateral, and compressor replacements that do not qualify under § 2.55(b) of this chapter because they ... will not satisfy the location or work space requirements of § 2.55(b).” 18 C.F.R. § 157.202(b)(2)(i).

.Section 2.55(b)(1) excludes from the definition of facilities the construction of which requires obtaining a new certificate those projects "which constitute the replacement of existing facilities that have or will soon become physically deteriorated or obsolete, to the extent that replacement is deemed advisa *319 ble, if ... [t]he replacement facilities ... will be located in the same right-of-way or on the same site as the facilities being replaced.” 18 C.F.R. § 2.55(b)(l)(ii).

. In this same vein, the Majority claims that a significant check on a natural gas company’s power to condemn easements under Part 157 for pipeline replacements is that the company must have within its possession a blanket certificate. But FERC's statement that "[a]l-most all interstate gas pipelines now hold [Pjart 157 blanket certificates that permit the automatic construction ... of certain ‘eligible facilities’ ” suggests that the Majority’s distinction is in effect no distinction at all. Emergency Reconstruction Final Rule, 68 Fed. Reg. at 31,598.

. The Majority also claims that I would require Columbia to use the same pipe in its construction efforts for those efforts to be categorized as a "replacement.” (Maj. Op. at 311-12.) The Majority cherry-picks examples from the dictionary and improperly treats the characteristics of those suggestions as limitations on the term “replace.” Nothing in what the District Court said or what I am saying has anything at all to do with the materials that may be chosen for a replacement project. This case is about where pipes are going into the ground, not which pipes are being used.

. It bears mentioning that at least three Supreme Court justices have indicated an interest in revisiting the holding in Auer. In Decker v. Northwest Environmental Defense Center, — U.S. —, 133 S.Ct. 1326, 185 L.Ed.2d 447 (2013), Chief Justice Roberts, joined by Justice Alito, concurred in applying deference to an agency interpretation, but explained that, even though it would have been improper to reconsider Auer in that case because the parties did not properly preserve the issue in their briefs, the Court should be prepared to do so in a subsequent case. Id. at 1338 (Roberts, C.J., concurring). Justice Scalia, in dissent, noted his discontent with what Auer has become: "For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of 'deferring] to an agency’s interpretation of its own regulations.' ” Id. at 1339 (Scalia, J., dissenting).

. The requirement to consider under Skid-more an agency interpretation that has failed the test for Auer deference shows just how deeply embedded the idea of deference to agencies has become. If an agency interpretation has already been determined to be "plainly erroneous” or something less than the product of "fair and considered judgment,” it would seem very unlikely to have the power to persuade, but the Skidmore base must nonetheless be touched.

. Given that footnote 78 has nothing to do with the subject of the Revisions to Auxiliary Installations — which is auxiliary facilities, see Revisions to Auxiliary Installations, 78 Fed. Reg. at 72795 (explaining that the purpose of promulgating the revisions is "to clarify” regulations governing "auxiliary installations added to existing or proposed interstate transmission facilities”) — it is ironic that the Majority endeavors to dismiss as mere dicta FERC’s comments in the Emergency Reconstruction Notice. Those comments had the merit of being pertinent to the subject of the Notice.

. Columbia rightly points out that the Supreme Court has deferred to after-the-fact interpretations before, particularly in an amicus brief filed after the case had reached that Court. See Decker v. Nw. Envt’l Def. Ctr., — U.S. —, 133 S.Ct. 1326, 1337-38, 185 L.Ed.2d 447 (2013). But the Supreme Court in Decker looked past the post hoc nature of that brief primarily because "[t]he agency [in question] has been consistent in its view that the types of discharges at issue here do not require ... permits.” Id. Here, however, the Footnote Rule contradicts the Emergency Reconstruction Notice’s prior interpretation of Part 157.
The Majority also says that FERC is not " 'seeking to defend past agency action against attack’ ” and thus the Footnote Rule cannot be read as a post hoc rationalization. (Maj. Op. at 313 (quoting Christopher, 132 S.Ct. at 2166).) But FERC is absolutely justifying its failure to require Columbia to obtain a new certificate of merit for proposed Line 1655. Moreover, even if there were no agency decision to defend, the analysis is not so limited. Both the Auer and Decker Courts permitted relevant federal agencies to submit after-the-fact interpretations in amicus briefs in support of another agency’s application of their regulations and not their own actions. See Decker, 133 S.Ct. at 1337-38 (EPA defending state decision-maker’s determination); Auer, 519 U.S. at 461, 117 S.Ct. 905 (Secretary of Labor defending members of the St. Louis Board of Police Commissioners). Despite that difference, the Supreme Court went on to consider whether those interpretations were post hoc rationalizations. Decker, 133 S.Ct. at 1337-38; Auer, 519 U.S. at 461, 117 S.Ct. 905. In this case, one could interpret FERC to be likewise defending another's interpretation of its rules; the fact that the interpreter is a private company is of no moment.

. In addition to not being the product of fair and considered judgment, the Footnote Rule is plainly erroneous because the interpretation renders the relevant regulations internally inconsistent and constitutionally infirm, as I will discuss further hereafter.

. The District Court noted that this case “does not rise and fall based on the definition of adjacency” because it is not a close call whether the new route for Line 1655 is adjacent — the proposed route is "entirely new.” (App. at 53 n. 1.).

. The Majority notes that no constitutional arguments were raised in this case. That may be so, yet "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.” Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). We are attempting to understand the meaning of the regulation in question, and I am merely applying the canon of constitutional avoidance. That canon “is not a method of adjudicating constitutional questions”; rather, it "is a tool for choosing between competing plausible interpretations of a statutory [or, in this case, a regulatory] text.” Clark v. Martinez, 543 U.S. 371, 381, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). The aim is to avoid constitutional problems, and we are not bound by the parties' arguments in determining which interpretive tools are relevant and how they bear on the proper construction of governing law.

. That information includes a “description of the facilities,” a listing of the “specific purpose, location, and beginning and completion date of construction of the facilities installed,” the “actual installed cost,” and descriptions of consultations made regarding various environmental regulations. 18 C.F.R. § 157.208(e)(l)-(4).

. The fact that Columbia conveniently obtained the waiver in the middle of the proceedings below suggests that FERC did not engage in any substantial deliberation before issuing it. What is more, FERC’s proffered justification for the waiver was that the landowners pushed back in negotiations, which caused construction to be delayed. In essence, the cost limitation was waived for the precise reason it should not be: because property owners questioned the exercise of eminent domain. The waiver sets a troubling precedent that punishes property owners for attempting to rely on protections afforded them in an eminent domain process that the agency is supposed to oversee.

. The Majority characterizes § 717f(c)(l)(A) as only being applicable to extensions of already-existing facilities. (Maj. Op. at 314 n. 19.) But the statute is not so limited, as it applies to “any proposed construction or extension.” 15 U.S.C. § 717f(c)(l)(A) (empha *331 sis added). There is no dispute that the project constitutes a “construction”; in fact, FERC in its Footnote Rule aptly described replacements outside the original right-of-way as "construction of ... main line facilities ... without restriction on their location.” Revisions to Auxiliary Installations, 78 Fed.Reg. at 72804 n. 75. Columbia likewise refers to its replacement project as a construction, noting that "[i]f [it] is not able to begin construction on the properties by September 1, 2014, weather events could have a significant disruptive effect.” (Appellant's Opening Br. at 8, 39.)
In any event, the distinction between an "extension” and "proposed construction” is meaningless in this case because the regulatory goal as to both is to place significant controls over a natural gas company acquiring additional property, no matter the reason. FERC has promulgated such controls for construction, expansion, or any other purpose requiring a FERC certificate, "to ensure that landowners will be informed of any proposed infringement of their property rights, and will have an opportunity to contest such proposed infringements, prior to condemnation proceedings.” Williston Basin Interstate Pipeline, Co. v. An Exclusive Gas Storage Leasehold, 524 F.3d 1090, 1097 (9th Cir.2008) (emphasis added) (citing 18 C.F.R. §§ 157.6(d)(2)(iv), 157.6(d)(3)(v), 157.10 (procedures for obtaining a FERC certificate)).

. In fact, Columbia concedes that it was free to petition FERC for another certificate of public convenience and necessity to authorize *332 its current project, but it chose not to. Had it done so, much delay and expense would have been avoided here. But Columbia wants a precedent for the exercise of power. That is unfortunate because, if everything is as Columbia claims, the pipeline construction would be underway and perhaps completed, the Landowners' rights would have been addressed, and safety issues, to the extent there are any, would have been resolved.

. The Majority implies that I am standing in the way of safety measures. That is not my position. I am certainly not suggesting that pipes be left to rot in the ground. A gas company can maintain or replace its pipeline on or adjacent to its certificate’s designated right-of-way, but if it strays beyond that, the regulations and the Constitution bring procedural protections into play that require a utility to approach FERC for a new certificate. Notice and an opportunity to be heard are basic protections for the property rights of American citizens.

. The Majority also errs in reversing the District Court's denial of Columbia's request for a preliminaiy injunction and immediate possession of the easements. Because I believe Columbia lacked the authority to condemn the easements by the power of eminent domain, as discussed above, I would also conclude that Columbia does not have a right to immediate possession of the easements. But even assuming Columbia’s success in this case, the speculative nature of Columbia's proffered evidence cuts against an injunction. The testimony of Doug Holley, a former employee and current easement-contract negotiator, is persuasive. At the preliminary-injunction hearing below, he conceded that he "do[es not] know as an individual [whether the line could fail soon] because [he] ha[s] not seen the line, [he] ha[s] done no testing on the line, [and he] can’t speak to whether there is an immediate danger. [He is just] assuming there is because [his] company has put into place this prioritization system [to determine which line to replace next].” (Preliminaiy Injunction H’g Trans, at 53:19-24.) Columbia proffers no evidence indicating that a threat is imminent. Therefore, based only on the information before us, a preliminary injunction is not the proper remedy here.